# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 05-3926

_____

| | | |
|---|---|---|
| Maricella Bosibore Onsongo, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Petition for Review of an Order of |
| | * | the Board of Immigration |
| Alberto Gonzales, Attorney | * | Appeals. |
| General of the United States of | * | |
| America, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: June 16, 2006
Filed: August 10, 2006

_____

Before SMITH, HEANEY and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Maricella Bosibore Onsongo, a citizen of Kenya, petitions for review of a Board of Immigration Appeals ("BIA") decision affirming the immigration judge's ("IJ") denial of Onsongo's application for asylum, withholding of removal and relief under the Convention Against Torture ("CAT"). Onsongo submitted the application after

the Immigration and Naturalization Service ("INS")[1] charged her with being removable for overstaying a 2001 visitor's visa. For the reasons discussed below, we deny Onsongo's petition.

## I.    BACKGROUND

Onsongo was the sole witness to testify before the IJ. According to her testimony at the May 2003 hearing, Onsongo has five children and formerly was married to John Nyangeri, a Kenyan man and the father of her children. Her children and Nyangeri still live in Kenya, and she has kept in regular contact with Nyangeri while in the United States. In 1998, Onsongo joined the Democratic Party ("DP"), an opposition party in Kenya dedicated to protecting human rights, and served as treasurer of the local Mau-Narok branch. Kenyan government officials routinely harassed her and other members of the DP. In 1998 police arrested Onsongo and her brother at their farm, beat them, and left them in jail for two weeks under horrible conditions. In 2001, police arrested Onsongo at the store she owned and operated, beat and raped her, and left her in jail for seven days before releasing her. Onsongo's store was burned down as well, an act she believed was committed by government officials. Two days after her release from prison in 2001, Onsongo registered her marriage to Nyangeri, with whom she had been in a long-term relationship since 1983. Five days later she applied for a United States visitor's visa. Onsongo told consular officers that she was coming to the United States for a visit, but she did not tell them she was fleeing Kenya.

On cross-examination, Onsongo testified that the group to which she belonged was Democratic Party Human Rights, a human rights organization separate from the

---

[1]The INS ceased to exist on March 1, 2003, and its functions were transferred to the new Department of Homeland Security ("DHS"). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002). We will continue to refer to the DHS as the INS throughout this opinion.

DP.  According to Onsongo, she was involved in creating this organization in order to "put it with the democratic party so that we can have more money possibly."  The group engaged in various activities to oppose abuses by the Kenyan government, including looking after people who were harassed by the government, fighting for people's lives, collecting money for eventual action against the government, and holding strategy meetings.  The group also had political candidates run under its name, although it was not a political party.

Upon questioning from the IJ, Onsongo said the name of the organization was actually Human Rights Africa ("HRA").  However, throughout Onsongo's testimony and in her corroborating evidence, the group is referred to by many different names.[2]  Onsongo claimed to be one of the original HRA members since its inception in 1994.  She feared persecution upon her return to Kenya on account of her past involvement in HRA's opposition activities, despite the fact that the DP has been part of the Kenyan government's ruling coalition since 2002 and the leader of the DP, Mr. Mwai Kibaki, is now the president of Kenya.

Onsongo's corroborating evidence at the first hearing included two letters.  The first was an April 24, 2003 letter from an unnamed "Chief of Mau-Narok Location," ("chief") stating that since 1998 Onsongo had been a member of the "group fighting for the Human rights."  The second was a letter from Onsongo's Kenyan lawyers stating that she used to belong to "Human Rights Group."  Onsongo also submitted a document from the Senior Resident Magistrate's Court at Nakuru detailing a criminal proceeding stemming from her 2001 arrest.  According to the court document, Onsongo had been arrested in August 2001, along with many other people, while participating in an illegal meeting she had organized as an official of "the said

---

[2]The other names used include:  African Human Rights Kenya, National Human Rights, African Human Rights Kenya Chapter, and Human Rights Kenya Chapter.

Human Rights Group." The court document also indicated that the chief had testified against her in the proceeding.[3]

At the end of the hearing, the IJ expressed concern about "significant gaps" in Onsongo's testimony and about the authenticity of some of the supporting documentation. Consequently, the IJ requested that the INS determine the authenticity of the court document. The IJ continued the hearing to allow Onsongo to produce objective corroboration of the existence of HRA, of her membership and leadership roles in the DP and HRA, and of the abuse she suffered related to her DP membership.

At the October 2003 continued hearing, Onsongo's new corroborating evidence included a different April 24, 2003 letter from the chief and a letter from the chairman of HRA confirming Onsongo's membership and position as treasurer in "Human Right [sic] Kenya Chapter." The evidence also included a DP membership card, with Onsongo's name misspelled, and an original members list for "African Human Rights Kenya Chapter" that included Onsongo's name. The IJ expressed continuing concern about the authenticity of the documents. He also noted that many of Onsongo's documents from different people and organizations apparently had been sent from the same post office box in Kenya. In explanation, Onsongo stated that the chief, the DP, HRA, and her husband all shared P.O. Box 121. As for the two April 24, 2003 letters from the chief, Onsongo said she could not offer an explanation to address the IJ's concerns, which included suspicion that the letters were signed by two different people. Onsongo attempted no explanation to address the IJ's concerns about her other corroborating evidence. Finally, she said that she had simply neglected to contact the DP for evidence that the IJ had requested to corroborate the existence of HRA and her involvement in HRA and the DP. The INS did not provide forensic

---

[3]We note that the specific portions of this document that purportedly corroborate Onsongo's testimony about her role in HRA appear to be in bold type. If the document is authentic, the court was strangely prescient about which portions of the document would be of interest to later readers in an immigration proceeding.

evidence on the authenticity of the court document, and the issue was not addressed at the second hearing.

In his written opinion, the IJ concluded that "this is an incredible claim, deserving of no credence." He noted Onsongo's shift in testimony from her role in the DP to her role in HRA and her failure to produce objective corroboration of her prominent role in either group or of the identity and activities of HRA. The IJ also found that much of Onsongo's corroborating evidence "ha[d] all the hallmarks of fraud." Specifically, he noted that the court document contained numerous misspellings and strike-overs, and bore "more than a passing typographical resemblance" to the letter from Onsongo's lawyers. He also found it suspicious that the chief, who testified against her in the criminal proceeding, would then write to support her application for asylum. The IJ was equally concerned about the authenticity of the letters from the chief because they gave no name for the chief, vaguely referred to a human rights group, were dated the same day, had slightly different signatures, and one was notarized by the "Commissioner of Oats" while the other was not. He was also suspicious about the letter purportedly from the chairman of HRA because the letterhead had a different name for the human rights group than did the body of the letter. Finally, the IJ noted that the return envelopes from the chief, HRA, the DP and Onsongo's husband all bore the address P.O. Box 121, the same P.O. Box as Onsongo's last residence and business mailing addresses. As a result, the IJ concluded that Onsongo's claim was not credible.

In addition to the adverse credibility finding, the IJ concluded that even if Onsongo had established past persecution based on a protected ground, the DP's ascendance to a position in Kenya's ruling coalition and Mr. Kibaki's position as president of Kenya suggested that she would no longer have a well-founded fear of future persecution in Kenya. This was particularly so because Onsongo had reported to Kibaki when he was DP president and she was local DP treasurer. Accordingly, the

-5-

IJ denied asylum, withholding of removal and CAT relief. The BIA found no clear error in the IJ's adverse credibility finding and did not discuss the alternative finding.[4]

## II. DISCUSSION

The Attorney General has discretion to grant asylum to a refugee, defined as an alien who is unable or unwilling to return to her home country because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group or political opinion. *Falaja v. Gonzales*, 418 F.3d 889, 894 (8th Cir. 2005); *see* 8 U.S.C. § 1101(a)(42), 1158(b)(1); 8 C.F.R. § 208.13. As the wording of the statute indicates, the alien must show not only persecution or a fear of persecution, but also that such persecution is "on account of one of the five protected grounds." *Hassan v. Ashcroft*, 388 F.3d 661, 666 (8th Cir. 2004); *see also Gomez v. Gonzales*, 425 F.3d 543, 545 (8th Cir. 2005) ("To reverse the finding that the alleged persecution was not based on a protected ground, it is necessary that the record compel the finding that a protected ground motivated the [persecution].").

We defer to the IJ's findings of fact and disposition of the case unless the record evidence is "'so compelling that no reasonable factfinder could fail to find' [the petitioner] eligible for asylum, withholding of deportation, or relief under the Convention Against Torture." *Habtemicael v. Ashcroft*, 370 F.3d 774, 779 (8th Cir.

[4]We reject the INS's argument that Onsongo's failure on appeal to address the IJ's alternative ground for denying the application—that she failed to establish a well-founded fear of future persecution—is a proper basis upon which to deny her petition. When the BIA does not consider the IJ's alternative ground for denying relief, that ground is not properly before this court. *Fofanah v. Gonzales*, 447 F.3d 1037, 1040 (8th Cir. 2006) (holding that only the BIA order is subject to this court's review, including the IJ's findings and reasoning to the extent they were expressly adopted by the BIA). Because the BIA's opinion in this case did not discuss this alternative ground, Onsongo was not required to address it.

2004) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992)); *see also* 8 U.S.C. § 1252(b)(4)(B).  We must affirm the IJ's decision if it is supported by substantial evidence in the record, and we defer to the IJ's credibility finding when it is supported by specific, cogent reasons for disbelief.  *Eta-Ndu v. Gonzales*, 411 F.3d 977, 982 (8th Cir. 2005).  In this case, we conclude that the IJ's adverse credibility finding was not erroneous because Onsongo's inconsistent testimony, her suspect corroborating evidence, and her failure to provide additional, specifically requested corroborating evidence all support the finding.

First, the IJ offered specific, cogent reasons supported by substantial evidence in the record for his finding that Onsongo's testimony was not credible.  Although an IJ may not base an adverse credibility determination on speculation or conjecture, *Cao v. Gonzales*, 442 F.3d 657, 660 (8th Cir. 2006), he may base an adverse credibility finding on the "'implausibility' of an alien's testimony, as long as the IJ gives specific and convincing reasons for disbelief," *Mamana v. Gonzales*, 436 F.3d 966, 968 (8th Cir. 2006).  This court considers whether a reasonable factfinder would be compelled by the record to credit the disputed testimony.  *Id.* at 969.  "While minor inconsistencies and omissions will not support an adverse credibility determination, inconsistencies or omissions that relate to the basis of persecution are not minor but are at the heart of the asylum claim."  *Jalloh v. Gonzales*, 423 F.3d 894, 898 (8th Cir. 2005) (quoting *Kondakova v. Ashcroft*, 383 F.3d 792, 796 (8th Cir. 2004)).

Onsongo argues that it was unreasonable for the IJ to focus almost entirely on the "technical area" of the relationship between the DP and HRA to the exclusion of her other testimony and to require her to explain the "fairly complex relationship" between the two groups and her role in them.[5]  She also argues that the IJ engaged in

---

[5]The dissent also contends that our conclusion ignores evidence of Onsongo's persecution and is "nitpicking" in its focus on the nuances of her political affiliation. We would be inclined to agree if the IJ's adverse credibility finding was based simply on confusion surrounding the name of Onsongo's political group.  To the contrary,

speculation when he concluded that her testimony on these issues was not credible. We find these arguments unconvincing. Far from being a "technical" or peripheral detail, Onsongo's testimony on these issues goes to the basis of her past persecution and fear of future persecution and, thus, the heart of her asylum claim. In addition, rather than speculating about the basis of her past persecution and fear of future persecution, from very early in the first hearing the IJ repeatedly asked Onsongo for clarification as to whether she was involved in the DP or HRA, what the relationship was between the organizations, and why she was using different names for HRA. When Onsongo's explanations failed to resolve the inconsistencies in her testimony, the IJ continued the hearing to give her an additional opportunity to explain and support her testimony. He properly discredited the testimony when Onsongo's additional explanations failed to provide sufficient clarification. *See Fofanah*, 447 F.3d at 1040 (upholding an adverse credibility finding that was based on inconsistencies and inadequacies in the most critical portions of petitioner's testimony); *Jalloh*, 423 F.3d at 896-98 (upholding an adverse credibility finding where the petitioner had not presented convincing explanations for discrepancies and inconsistencies).

Onsongo further argues that the IJ erred by not identifying specific areas of her story that were "clearly false," and contends that her story was "plausible." We reject these arguments because an IJ need not find testimony "clearly false" before making an adverse credibility determination, so long as the determination is supported by "specific, cogent reasons." Further, even if Onsongo can reconstruct a plausible

---

Onsongo's inconsistency on this issue was merely one catalyst for the IJ's eventual adverse credibility determination. The record is rife with suspect testimony and suspect documentation on the core issue of whether Onsongo's claimed persecution was on the basis of her political affiliation or opinion. We believe the dissent misses the mark by failing to view Onsongo's testimony in light of that context. *See Bellido v. Ashcroft*, 367 F.3d 840, 843 (8th Cir. 2004) (noting that petitioner's testimony should be viewed in light of the entire evidentiary record).

version of her account from the record, that fact does not compel the conclusion that the IJ erred in finding her testimony implausible. *Krouchevski v. Ashcroft*, 344 F.3d 670, 673 (7th Cir. 2003) (holding that where credibility determinations are concerned, a reviewing court should not supersede an agency finding simply because an alternative finding could also be supported; rejecting petitioner's *post hoc* interpretations of his testimony). Thus, substantial evidence in the record supports the IJ's finding that Onsongo's testimony was not credible.[6]

Second, substantial evidence in the record supports the IJ's finding that Onsongo's corroborating evidence was not credible because it bore hallmarks of fraud. An IJ may base an adverse credibility determination upon submission of fraudulent documents if the petitioner fails to offer a legitimate explanation for the suspected fraud. *Ambroise v. Gonzales*, 411 F.3d 932, 933 (8th Cir. 2005) (per curiam); *see Bropleh v. Gonzales*, 428 F.3d 772, 777-78 (8th Cir. 2005) (affirming an IJ's adverse credibility finding based in part on the submission of a fraudulent document).

Onsongo argues that the IJ erred in concluding that her corroborating evidence bore hallmarks of fraud because the INS failed to provide forensic evidence to support the conclusion. However, forensic evidence of fraud is not necessary where, as here, the documents bore readily identifiable indications of fraud. *See, e.g.*, *Bropleh*, 428 F.3d at 777-78 (noting that an IJ's finding that the petitioner had altered his passport

---

[6]As further support for the IJ's adverse credibility finding, we note that some of Onsongo's own corroborating evidence calls her testimony into question. For example, Onsongo testified that she was one of the original members of HRA in 1994, but a letter from the chief states that she joined the group in 1998. Similarly, Onsongo testified that police arrested her in August 2001 "in my business doing business." However, the court document indicates that police arrested her, along with other members of her group, while they were attending an illegal meeting at Mau Narok Sports Ground.

did not require a forensic expert where the passport had been selectively burned in an area where evidence of a visa application would be found).

In concluding that Onsongo's corroborating evidence was not reliable, the IJ identified irregularities that were clearly evident from the face of her supporting documents: the use of P.O. Box 121 by numerous people and groups—the same P.O. Box that Onsongo listed as her mailing address; striking typographical similarities between documents purportedly from different sources; numerous errors and misspellings in the court document; the use of many different names for HRA, including a different name in the heading and the body of a letter supposedly from the chairman of HRA; and different signatures on two letters dated the same day, supposedly sent from the same unnamed chief. Onsongo attempted explanations for only two of these concerns: she speculated that the different signatures on the letters from the chief may have been the result of a practice of different people in the office signing such letters, and she claimed that numerous people and organizations used P.O. Box 121. We agree with the IJ that Onsongo's explanations were unconvincing. Onsongo's explanation about the letters was admittedly speculation and did not address the many other questionable aspects of the letters. Likewise, her explanation that private individuals and major political parties share the same post office box is not plausible. Further, Onsongo made no effort at the hearing to allay the IJ's concerns that her other corroborating evidence also contained indicators of fraud, and she makes no effort to confront these concerns on appeal. Thus, the record supports the IJ's finding that Onsongo's corroborating evidence was not credible.

Third, substantial evidence in the record supports the IJ's finding that Onsongo failed to produce specifically requested corroborating evidence. This Court has recognized that it is often difficult for petitioners to obtain documentation from their home country. *Ombongi v. Gonzales*, 417 F.3d 823, 826 (8th Cir. 2005). However, lack of corroboration, particularly from "friendly" sources, combined with other credibility issues, can provide support for an adverse credibility finding. *Id.*; *see also*

*Hoxha v. Gonzales*, 432 F.3d 919, 920 (8th Cir. 2006) (noting that corroborative evidence is not required to support an asylum application, but failure to present corroborating evidence that should be readily accessible to the alien is a reasoned factor for the IJ to consider in assessing credibility).

Onsongo argues that the IJ erred in basing the adverse credibility finding on her failure to produce the specific evidence requested because she did present additional corroborating evidence that supported her story. She contends she produced the best corroborating evidence she could, and "simply could not obtain" the exact documentation the IJ required. However, even assuming the evidence Onsongo did submit objectively corroborated her testimony, the IJ properly found that evidence unreliable as discussed above. As for the specifically requested evidence, Onsongo failed to provide objective corroboration of the existence of HRA and failed to contact the DP for corroboration of her role in the organization, both essential to verify the claimed basis of her past persecution and fear of future persecution. When the IJ asked why she failed to contact the DP, Onsongo and her counsel responded that they simply did not do it. This fact belies the claim that Onsongo obtained the best corroborating documents she could, particularly given her testimony that she formerly reported to the man who is now president of Kenya and that she was the local branch treasurer of a political party that is now part of Kenya's ruling coalition. *See Ombongi*, 417 F.3d at 826; *Eta-Ndu*, 411 F.3d at 985 (finding that implausible explanations for suspicious letters, coupled with a lack of objective corroboration, undermined the petitioner's case); *Nyama v. Ashcroft*, 357 F.3d 812, 817 (8th Cir. 2004) (per curiam) (affirming an adverse credibility determination based on the lack of corroborating evidence where the IJ gave the petitioner six months to gather more evidence and the petitioner did not even make an effort to contact the political party). Thus, the record supports the IJ's finding that Onsongo failed to produce specifically requested corroborating evidence. Accordingly, we conclude that the IJ's adverse credibility finding is supported by specific, cogent reasons for disbelief, which necessarily entails the further conclusion that the record does not compel a reasonable

-11-

factfinder to find Onsongo eligible for asylum. We therefore affirm the denial of her application for asylum.

Finally, because Onsongo's requests for withholding of removal and CAT relief were based upon the same discredited testimony and evidence as her asylum claim, we affirm the denial of those claims as well. *Fofanah*, 447 F.3d at 1040 (holding that when withholding of removal and CAT claims are based on same discredited testimony as an asylum claim, an adverse credibility finding is fatal to all three claims).

## III.    CONCLUSION

We conclude that the IJ did not err in denying Onsongo's application for asylum, withholding of removal and relief under the CAT. Therefore, we deny Onsongo's petition for review.

HEANEY, Circuit Judge, dissenting.

Onsongo testified that her affiliation with an opposition political group resulted in her being twice arrested and held for several days in dire conditions in Kenya. Following one of these arrests, she was raped by two police officers, who then beat her until she was unconscious. Shortly after she was released from jail, she found her place of business burned down. The IJ found her testimony incredible. Having reviewed the entirety of the administrative record, I disagree; it is clear that the IJ was more focused on minor incongruities with regard to Onsongo's political affiliation than whether Onsongo truly suffered the abuse she recounted.

Onsongo testified consistently that she was a member of a group that opposed the regime in power in Kenya. She testified consistently that her group worked to protect and preserve the human rights of those oppressed by the government. She

testified consistently that she was the treasurer of this group, and that authorities knew she was a member. She testified that because of her membership, she was arrested two times and held in inhumane conditions. Following one of the arrests, she was raped by two policemen and beaten until she lost consciousness. Shortly after this, she fled the country.

The IJ, BIA, and majority ignore this evidence because of confusion surrounding the name of Onsongo's political group. I agree that the Administrative Record does not stand as a model of clarity on this issue.[7] As the majority notes, there are questions surrounding the relationship between the Democratic Party (DP) and Human Rights Africa (HRA). That ought not be used as a basis to deny Onsongo's application, however. First, she was clear that she was a member of one or both of these groups, and that both groups opposed Kenya's governing regime. As early as her first asylum application, filed on October 1, 2002, Onsongo stated that she was an "active member" of HRA and her family "belonged to" DP. (Admin. Rec. at 496.) In later proceedings, she used these names interchangeably. She explained that HRA was a local organization, and they maintained an affiliation with the DP to increase their visibility and stature. (*See* Admin. Rec. at 186-87 ("Our party was the Human, African Human Rights Kenya. The Democratic Party was our head organization.").)

_____

[7]Nor does the Administrative Record reflect the level of decorum that one would expect from an official proceeding before an agency of the United States government. First, Onsongo was not provided a Swahili interpreter at her initial interview with the INS or at her first hearing before an IJ. Although she received interpretative assistance at her subsequent hearings, other irregularities infected the hearings. During one hearing, the IJ ordered Onsongo to remove the contents of her purse and surrender envelopes and documents contained therein to the IJ to be used as evidence in this case. Meanwhile, the lawyer for the government questioned Onsongo as to whether she was really the mother of the children listed in her asylum application, a question whose motivation is not apparent in the record. The same lawyer expressed disbelief when Onsongo could not calculate the correct exchange rate for Kenyan currency to United States dollars.

-13-

She showed a membership card for DP, and stated that HRA did not offer cards because they would put the members in jeopardy of persecution. When questioned, she stated the full names of the administrative officers of HRA. The IJ expressed frustration that Onsongo did not provide more "objective" evidence corroborating her HRA membership, but her testimony indicated the organization was a local one, with roughly six hundred dollars in its coffers. Even so, Onsongo was able to procure a 1998 master list of HRA's charter members. This was not enough to satisfy the IJ, but what more could Onsongo do? An applicant should not be penalized for failing to procure evidence that simply is not available. *Accord Bellido v. Ashcroft*, 367 F.3d 840, 844 (8th Cir. 2004) (noting that it is often difficult to obtain documents from an asylum applicant's home country, but this "should never serve to close the door on a grant of asylum").

In my view, the majority misses the mark in nitpicking the nuances of her political affiliation.[8] She is not required to show with excruciatingly specific detail the relationship between Kenya's national and local opposition parties and groups. Rather, it is only necessary that Onsongo show that her affiliation with those groups or their beliefs subjected her to persecution. *See* 8 U.S.C. §§ 1101(a)(42)(A) (defining "refugee" as a person who cannot return to their home country due to persecution "on account of . . . membership in a particular social group, or political opinion"), 1158(b)(1)(A) (stating a refugee is eligible for asylum). She obviously met this test. When asked at her hearing whether persecuting governmental authorities would know her as a member of HRA or DP, she stated essentially that it did not matter, because

---

[8]The majority suggests that the IJ's credibility determination is supported not only by the confusion over Onsongo's party membership, but also by the entirety of the Administrative Record. I disagree. Having reviewed that record, it details a compelling tale of Onsongo twice being arrested and held in jail, being raped by two police officials, and losing her business to arson, all because of her political affiliation. Rather than develop the record with regard to these instances of persecution, the IJ instead focused on but one thing: the name of Onsongo's political group.

-14-

it was her affiliation with any type of opposition group that led to her maltreatment. (*See* Admin. Rec. at 200 ("They used to differentiate us by the fact that we were against the government.").)  Our asylum laws are intended to protect aliens against precisely this type of persecution, and I believe they ought to in this case. Thus, I would grant the petition.[9]

———————————————

[9]The IJ found that Onsongo was not at risk of future persecution because the party with which she was affiliated was now in power.  As the majority notes, this issue is not properly before us because it was not a basis of the BIA's affirming decision.