# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3303

_____

| | |
|---|---|
| Ji Ying Chen, | * |
| | * |
| Petitioner, | * |
| | * Petition for Review of an |
| v. | * Order of the Board of |
| | * Immigration Appeals. |
| Michael B. Mukasey, Attorney | * |
| General of the United States, | * |
| | * |
| Respondent. | * |

_____

Submitted: November 12, 2007
Filed: December 26, 2007

_____

Before WOLLMAN, JOHN R. GIBSON, and BENTON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Ji Ying Chen petitions for review of the BIA's order denying his application for asylum, withholding of removal, and relief under the Convention Against Torture. Chen contends that the BIA erred in affirming the Immigration Judge's adverse credibility finding. The IJ relied on inconsistencies between his testimony and his earlier asylum affidavit and on implausibilities in Chen's story to reject Chen's testimony that he was wanted by the Chinese government because he had driven his mother to a Falun Gong[1] practice. We deny the petition for review.

_____

[1]Falun Gong is a spiritual sect that was outlawed in China in 1999.

Chen arrived at the Virgin Islands on June 30, 2002, by ship, and came ashore without inspection. The Immigration and Naturalization Service took him into custody and charged him with removability for entering the United States without being admitted or paroled. Chen was released on bond and moved to Minnesota.

On January 16, 2003, he applied for asylum, withholding of removal, and relief under the Convention Against Torture, claiming that he feared he would be persecuted in China on account of religion. He filed an affidavit saying that his mother had taken to Falun Gong as a remedy for arthritis and that he drove her to her practices for several months. Chen said in his affidavit that on October 3, 2001, five policemen came to his house looking for him, saying that he had joined a Falun Gong organization. Luckily, he was not home, and his parents told him to stay away. According to the affidavit, about a week later, seven or eight policemen came to the house, again looking for him. They smashed furniture, and Chen's father protested, "What crime did my son really commit?" Chen's affidavit said, "A young policeman said viciously to my father: 'You dare to talk back?'" The police then beat his father, who lost consciousness and had to be taken to the hospital, "where his life was saved." The affidavit mentions his mother in this scene only to say that she "wept and shouted and yet no one came to the rescue." Chen said he took refuge at a friend's house in Chengdu, Sichuan province. The affidavit continues by recounting Chen's decision to flee to the United States and his route from Fuzhou to Guangzhou, then on to Hong Kong, next to an unknown place, and finally to the Virgin Islands.

At his hearing before the IJ, Chen again recounted the story of how the police came to his parents' house the second time, identified as October 12, 2001, but in this account, he stated that the police beat his mother and she lost consciousness. Later, he said that his mother did not get medical treatment because it was nothing serious. When asked how many times the police hit his mother, at first he said she did not say, but then he said it was "a couple of times." He explained that he first found out that his mother had been hit the Saturday before his hearing; he said she did not tell him

-2-

before because she did not want him to worry. He said that after the October 12 incident he took refuge at his grand aunt's house. Later, he said he initially fled to his grand uncle's house, then went to stay with friends. He said his father paid 50,000 American dollars for a smuggler to get him to the United States. He said he went from Fuzhou to Guangzhou, where someone was waiting for him with a travel document with his picture and name, which he used to leave China. He flew to Hong Kong, then to another unidentified place where he was kept in a tiny house for about ten days. He then boarded a ship, where he was with about twenty other people in the hold; after fifteen to seventeen days, the ship put them ashore in the Virgin Islands, where they were taken into INS custody. His uncle, an asylee who owns a restaurant in Minnesota, paid for his bond and took him in. Chen testified that he was bored at his uncle's house, so he decided to learn to cook in the restaurant. Chen submitted a letter from his father who recounted the October 12, 2001 incident in detail without mentioning any violence committed against his wife, and who said that he had told his son to hide with his grand aunt after the first police visit. Chen also said that his brother had moved away from home in order not to "get involved" in the family's problems.

The IJ decided that Chen was not credible because of various inconsistencies and implausibilities in his story. Her principal findings were that it was implausible that police would look for Chen, instead of his mother, since he did not practice Falun Gong and she did; that his failure to mention in his affidavit that the police had beaten his mother made it appear that he was not telling the truth when he later said she had been beaten; that if he were really wanted by the Chinese government, he would not have been able to leave using a passport with his real name and picture; and that it was implausible that he would not know any details about his journey, such as what airline he took, what countries he stayed in, etc. The IJ also found that because of Chen's evasiveness about his travel itinerary, Chen had not established his date of arrival in the United States in order to prove that he filed for asylum within one year of arrival. The IJ found that Chen was not wanted by the Chinese government because of any

-3-

connection to Falun Gong, but if he were, he could relocate within China to avoid any problem, as his brother has done. The IJ concluded that Chen had come to this country for economic reasons, in order to work at his uncle's restaurant.

After the IJ's initial opinion, both sides moved to remand to submit further documentation. Chen submitted a purported receipt from his father's hospital stay on October 12, 2001; however, the government submitted a report from the Department of Homeland Security stating that the receipt had been determined to be counterfeit. A further hearing was held, in which Chen was questioned about how he obtained the document; he said that his father could not find the original receipt, so he had used his "connections" to get it reissued. After the hearing, the IJ found that the document was fraudulent and that Chen had knowingly presented a fraudulent document as evidence. Accordingly, in addition to adhering to her earlier decision, the IJ denied Chen's asylum application as an exercise of discretion.

The BIA adopted and affirmed the decision of the IJ, with additions. The BIA observed that Chen had submitted documents to the BIA that were not before the IJ, but the BIA stated that it would not consider evidence not before the IJ. Chen did not file a motion to reopen, but the BIA said that even if it had decided to treat his filing as a motion to reopen, he would not have met the requirements for such a motion, since he did not present evidence casting doubt on the IJ's adverse credibility determination and therefore did not make a prima facie case that he was entitled to relief.

Chen petitions for review, arguing that the BIA erred in affirming the IJ's finding that he was not truthful because the IJ's finding was not supported by "specific and cogent reasons." He argues that the inconsistencies the IJ found important were too minor to support an adverse credibility determination, that the IJ had to credit his explanations for the inconsistencies, that the IJ's assessment of implausibilities was based on speculation, and that the IJ did not give him a chance to explain how he

could have left China using his own name when he was supposedly wanted by the Chinese government.

When the BIA adopts and affirms the IJ's decision, but also adds reasoning of its own, we will review both decisions together. Eta-Ndu v. Gonzales, 411 F.3d 977, 982 (8th Cir. 2005). We review the agency's findings of fact for substantial evidence under the statutory standard for immigration cases: "[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The Attorney General's discretionary decision not to grant asylum (delegated to the IJ, 8 C.F.R. § 1208.14(a)) is conclusive unless "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). The burden of proof is on the applicant for asylum, withholding of removal, and relief under the Convention Against Torture to establish eligibility for relief, and the alien may sustain this burden by his own testimony, if credible. 8 C.F.R. §§ 1208.13(a), 1208.16(b), & 1208.16(c)(2).

The Real ID Act of 2005 codified in great detail the criteria IJs may use to make credibility determinations in immigration cases. See Pub. L. No. 109-13, Div. B, 119 Stat. 302-06, codified at 8 U.S.C. § 1158 (b)(1)(B)(iii), 8 U.S.C. § 1229a(c)(4)(C) & 8 U.S.C. § 1231(b)(3)(C). However, Congress did not make the new provisions applicable to cases in which the application for asylum or withholding was filed before May 11, 2005, see 8 U.S.C. § 1158 note (Effective and Applicability Provisions). Since Chen filed his application in 2003, we apply the law that existed before the Real ID Act in judging the adequacy of the IJ's credibility findings.

The substantial evidence standard was imported into administrative law from cases dealing with review of jury verdicts and is more deferential than the "clearly erroneous" standard used in reviewing findings of fact by a district judge. Menendez-Donis v. Ashcroft, 360 F.3d 915, 918 (8th Cir. 2004). Credibility determinations are considered to be the special province of the finder of fact under both the substantial

evidence standard used for jury verdicts and the clearly erroneous standard used for judicial findings. Compare United States v. Montano, 506 F.3d 1128, 1133 (8th Cir. 2007) ("It is axiomatic that we do not review questions involving the credibility of witnesses, but leave credibility questions to the jury. The jury is free to believe the testimony of any witness in its entirety, or to reject that testimony as untrustworthy.") (internal quotation marks and citations omitted) with United States v. Tucker, 243 F.3d 499, 506 (8th Cir. 2001) (when judge's finding concerns credibility of witnesses, "clear error" review is even more deferential than usual).

However, administrative "substantial evidence" review differs from that applied to jury verdicts in two respects. First, under the rule of Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88 (1951), in reviewing administrative fact findings we are required to take into account the record "as a whole," considering evidence that detracts from the administrative finding. Menendez-Donis, 360 F.3d at 918. In contrast, in reviewing a jury verdict, we draw every reasonable inference in favor of the verdict and may not make credibility determinations or weigh the evidence. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (applying Fed. R. Civ. P. 50[2]). Second, under SEC v. Chenery Corp., 318 U.S. 80, 94 (1943), any administrative agency must describe its reasoning with "such clarity as to be understandable," SEC v. Chenery Corp., 332 U.S. 194, 196 (1947), whereas a jury generally does not explain its reasoning. Because of these principles of administrative law, "substantial evidence" review of administrative findings entails review of an IJ's credibility determinations, see, e.g., Singh v. Gonzales, 495 F.3d 553, 556-59 (8th Cir. 2007), whereas "substantial evidence" review of a jury's findings defers almost entirely to the jury's credibility determinations, Reeves, 530 U.S. at 150-51 (reviewing court disregards all evidence "favorable to the moving party that the jury is not

---

[2]The Rule 50 standard is the same whether the court is deciding to take a case away from the jury or to enter judgment notwithstanding a contrary verdict. Askew v. Millerd, 191 F.3d 953, 956 n.4 (8th Cir. 1999).

required to believe"[3]).  Applying the <u>Chenery</u> rule and the administrative "substantial evidence" rule together, courts often say that an IJ must give "specific, cogent" reasons for his findings.  <u>See</u> <u>Singh</u>, 495 F.3d at 557-58.  In <u>Singh</u>, we explained that this means that an IJ making a credibility determination must "give reasons that are 'specific' enough that a reviewing court can appreciate the reasoning behind the decision" and cogent enough "that a reasonable adjudicator would not be compelled to reach the contrary conclusion." <u>Id.</u>

Chen argues that it was "speculation" for the IJ to say it was implausible that the Chinese police would come after him instead of his mother as part of a crack-down against Falun Gong, when it was his mother, not he, who participated in Falun Gong. Chen also terms it speculation for the IJ to conclude that if Chen had been wanted by the Chinese government, he would not have been able to cross the border using his own identity papers.  We have in the past refused to disturb IJs' findings based on assessments of plausibility, even though such assessments must ultimately depend on the fact-finder's notions of common sense and life experience.  <u>See, e.g.</u>, <u>Thiam v. Gonzales</u>, 496 F.3d 912, 914 (8th Cir. 2007) (affirming IJ's finding that it was implausible alien would have given her passport to a woman to deliver packages to Senegal); <u>Singh</u>, 495 F.3d at 558 (implausible that aliens would live for two years, rent-free, with persons with whom they had no prior relationship); <u>Gebresadik v. Gonzales</u>, 491 F.3d 846, 850 (8th Cir. 2007) (agreeing with IJ that it was implausible that alien in Ethiopia would have been entrusted with organizing demonstration on the very day she joined organization); <u>Onsongo v. Gonzales</u>, 457 F.3d 849, 855 (8th Cir.

---

[3]In <u>Reeves</u>, 530 U.S. at 151, the Supreme Court endorsed the statement in 9A Charles A. Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2529 at 300 (2d ed. 1995), that a court deciding a motion under Fed. R. Civ. P. 50 takes into account "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from <u>disinterested</u> witnesses." (emphasis added).  <u>See</u> <u>Salitros v. Chrysler Corp.</u>, 306 F.3d 562, 569 (8th Cir. 2002) (applying rule).

2006) (implausible that individuals and major political parties in Kenya share same post office box); see generally Dia v. Ashcroft, 353 F.3d 228, 261-64 (3d Cir. 2003) (en banc) (Alito, J., concurring and dissenting) (all finders of fact must rely on "background knowledge" of human behavior). While in certain cases, we have disagreed with the IJ's assessments of plausibility, see Hong Zhang Cao v. Gonzales, 442 F.3d 657, 660 (8th Cir. 2006) (disagreeing with IJ's determination that it was implausible that official would fail to notice that woman was five months pregnant); Shahinaj v. Gonzales, 481 F.3d 1027, 1029 (8th Cir. 2007) (credibility finding not based on substantial evidence where it was based on IJ's "personal and improper" opinion about how homosexuals would behave), we have done so only where the IJ's finding was irrational or based on improper bias.

We see no impermissible speculation in the IJ's determination that Chen's story was implausible. A rational person could conclude that police would be more interested in arresting an active participant in a forbidden activity than in arresting an accessory, and therefore that it was implausible that the Chinese police would relentlessly pursue Chen (the driver), but decline to arrest his mother (the Falun Gong adherent). A rational person could think that if Chen were forced to hide within China and flee the country to avoid the wrath of its government, he would not present government border officials his identification with his own name and picture. A finder of fact would not be compelled to find these aspects of Chen's story plausible.

Chen also argues that the IJ speculated in saying that it was implausible that Chen would have just learned the Saturday before the June 2003 hearing that his mother had been beaten by police on October 12, 2001. Chen told a detailed, even florid, story in his asylum affidavit about the events of October 12, 2001, including such details as

A young policeman said viciously to my father: 'You dare to talk back?' Then he slapped on my father's face. Several other policemen then gave

-8-

my father a round of good beating without saying anything. Then, they left the house. My father fainted away at the scene and my mother wept and shouted and yet no one came to the rescue.

He made no mention of any violence offered his mother. In contrast, at the hearing he testified, "While they beat up my father, my mother was on the side and screaming. Screaming. And my —they still beat up my mother, too. And then after, after that, my mother became unconscious." Chen explained his failure to mention any violence against his mother in the asylum affidavit by saying that what happened to his mother was minor, that she did not want to worry him, and that she had not mentioned it. Again, the IJ was entitled to rely on her own background knowledge of human behavior to think that if police looking for Chen had beaten his mother so that she fainted, someone would have told Chen and he would have mentioned it when applying for asylum. After all, Chen knew that his father had been beaten, so why would his parents have spared his feelings by concealing the lesser injury dealt his mother? The IJ could rationally conclude that the reason for the difference in the affidavit and in his testimony about what happened to his mother was that Chen was fabricating. The IJ did not have to accept Chen's explanation for why his testimony at the hearing contained a major incident missing from the already detailed account in his asylum affidavit of the events of October 12. See Hong Zhang Cao, 442 F.3d at 661 (omission of fact central to claim can be basis for adverse credibility finding).

Chen also argues that he had no opportunity to explain why he was able to leave China using his own passport despite the fact that he was allegedly a wanted man. Chen was represented by counsel and not only testified at the original hearing, but also on the hearing after remand, when the IJ had already made her initial adverse credibility findings. Chen made no attempt to explain why he was able to leave China without hindrance. His only explanation before us is that he "left with the help of the smuggler," which does not explain the difficulty inherent in his story that he identified himself to the government that was supposedly pursuing him and they let him go.

In sum, the IJ's adverse credibility determination was supported by substantial evidence. Since Chen's claims for asylum, withholding of removal, and relief under the Convention Against Torture all depend on the same discredited testimony, we must uphold the denial of each form of relief. See Onsongo, 457 F.3d at 855.

Finally, the IJ held that because of Chen's knowing use of counterfeited documents, asylum should be denied on discretionary grounds. See 8 C.F.R. § 1208.14(a) (IJ may grant or deny asylum to refugee in exercise of discretion). Chen makes no argument that this decision was manifestly contrary to law and an abuse of discretion. See 8 U.S.C. § 1252(b)(4). We therefore would be obliged to deny review of the asylum claim for this reason even if Chen had prevailed on the grounds he did argue.[4]

The petition for review is denied.

_____

[4]The BIA mentioned the submission of the counterfeit receipt as supporting the IJ's adverse credibility finding. An adverse credibility finding may be based on the applicant's knowing submission of fraudulent documents as evidence in his asylum proceedings. See Onsongo, 457 F.3d at 854. However, it appears that the IJ relied on the fraudulent document as a basis for exercising discretion against granting asylum, rather than as an additional basis for the adverse credibility finding.