# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 07-3263

_____

|                                   |     |                             |
|-----------------------------------|-----|-----------------------------|
| Thomas G. Redd,                   | *   |                             |
|                                   | *   |                             |
| Petitioner,                       | *   |                             |
|                                   | *   | Petition for Review of      |
| v.                                | *   | an Order of the Board       |
|                                   | *   | of Immigration Appeals.     |
| Michael B. Mukasey,               | *   |                             |
| Attorney General of the           | *   |                             |
| United States of America,         | *   |                             |
|                                   |     |                             |
| Respondent.                       |     |                             |

_____

Submitted: June 13, 2008
Filed: July 29, 2008 (Corrected: 09/05/2008)

_____

Before SMITH and GRUENDER, Circuit Judges, and ROSENBAUM,[1] District Judge.

_____

GRUENDER, Circuit Judge.

Thomas Redd, a native and citizen of Liberia, petitions for review of a Board of Immigration Appeals ("BIA") decision affirming the immigration judge's ("IJ")

_____

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

denial of Redd's application for asylum.[2] For the reasons discussed below, we deny Redd's petition for review.

## I. BACKGROUND

Redd entered the United States lawfully as a non-immigrant visitor for business in June 2003. Redd was authorized to remain in the United States until December 20, 2003, but remained after that date. The Department of Homeland Security initiated removal proceedings against him. At the removal hearing, Redd conceded the charge of removability and admitted that he had remained in the United States without authorization.

Redd sought asylum based on his membership in the Krahn, an ethnic group of native Liberians, which he feared made him a target for persecution. Redd alleges that he was detained by Sahr Gbollie, a Liberian police official, one or two months prior to October 14, 2000. Gbollie demanded that Redd spy on the Krahn and provide information related to the Krahn's opposition to the Charles Taylor government, which was in power in Liberia at the time. Redd said that he agreed to spy on the Krahn because Gbollie held him prisoner for three to four days without food, although he left Redd otherwise unharmed. However, Redd testified that once he was released, he did not provide any useful information to Gbollie.

Redd testified that he was at home with his wife, her parents and several other people on the night of October 14, 2000, when Liberian police officers broke into his house to find him. The police began shooting in his front yard, and during the commotion Redd escaped. The police then raped Redd's wife because they did not believe her when she told them she did not know where Redd was.

---

[2] The IJ and BIA also rejected Redd's claim for withholding of removal and protection under the Convention Against Torture ("CAT"). Because Redd does not argue these issues in his brief, we do not consider them as part of the petition for review. *See Alyas v. Gonzales*, 419 F.3d 756, 760 (8th Cir. 2005).

Redd fled the area and eventually contacted Patrick Roques, then the chief of security at the United States Embassy in Liberia. Redd testified that Roques gave him a letter from Gbollie addressed to Colonel Gabriel Duwanna ("Gbollie letter"), dated October 13, 2000, the day before his wife's rape, that stated Redd had played a "game" with Gbollie, was "to be eliminated without delay," and "deserved to die." Redd carried the Gbollie letter with him at all times until turning it over to the IJ at the removal hearing, along with his Liberian passport. He claimed that he was able to carry these documents with him in Liberia despite passing through numerous checkpoints staffed by the Charles Taylor government, for which Gbollie worked, and that he had no difficulties leaving Liberia for the United States using his own passport.

Redd's wife also testified on his behalf. She confirmed that she had been raped by police officers on October 14, 2000. However, she also stated that Redd had not been home the night she was raped. When asked if she had seen her husband around the time of the rape, she replied that she had not but that sometimes "he would send somebody to tell [her] what to do."

In support of his testimony, Redd offered an affidavit from Roques. The affidavit supported some of Redd's statements but contained several inconsistencies. Roques averred that Redd had been flogged, but Redd had denied that he was harmed while in custody. Roques's affidavit also states that "Redd and his family were strongly advised by close associates of the Liberian National Police to leave the country without delay," which Redd never mentioned in his testimony.

The IJ denied all of Redd's claims primarily because she found that he was not credible. First, Redd testified that he was at home on the night of his wife's rape; she stated that Redd had not been home all day. Second, Redd stated that his wife's parents were in the home on the night of her rape; she testified that her parents were not present that night. Third, the IJ found it was "not credible and implausible" that Redd would carry the Gbollie letter, which ordered Redd's execution, through checkpoints staffed by representatives of the Charles Taylor government, casting

-3-

doubt on the letter's authenticity. Fourth, the IJ found incredible Redd's claim that he was able to leave Liberia using his own passport if he were being sought by the government. Fifth, Roques's affidavit stated that Redd had been flogged while in Gbollie's custody, but Redd testified that he had not been harmed.

The IJ alternatively found that Redd's experiences did not rise to the level of persecution even if his testimony was assumed to be credible. She also determined that Redd had not established a well-founded fear of future persecution because the Charles Taylor regime was no longer in power in Liberia and Redd had presented no evidence as to Gbollie's current position. She further noted that conditions in the country had changed and that Charles Taylor was out of power and on trial for his actions. The IJ found that Redd failed to meet his burden of proof for asylum, and consequently he could not show that it was more likely than not that he would be persecuted if he returned to Liberia. The IJ then determined that Redd failed to show that it was more likely than not that he would be tortured by the government or someone acting on behalf of the government if he returned to Liberia. Therefore, the IJ also denied withholding of removal and relief under the CAT. Finally, the IJ denied voluntary departure as a matter of her discretion based on her credibility findings.

Redd appealed to the BIA, which adopted and affirmed the IJ's decision. Redd now petitions for review, arguing that the BIA erred in affirming the IJ's negative credibility finding and erred in determining that, even if he was credible, Redd failed to demonstrate a well-founded fear of future persecution.

## II.    DISCUSSION

Where the BIA adopts and affirms the IJ's decision and adds its own reasoning, we review both decisions together. *Setiadi v. Gonzales*, 437 F.3d 710, 713 (8th Cir. 2006). We review questions of law de novo. *Turay v. Ashcroft*, 405 F.3d 663, 666 (8th Cir. 2005). We affirm the BIA's and IJ's findings if they are supported by substantial evidence. *See Diallo v. Mukasey*, 508 F.3d 451, 454 (8th Cir. 2007);

*Ibrahim v. Gonzales*, 434 F.3d 1074, 1078-79 (8th Cir. 2006). "This is an extremely deferential standard of review. Under the substantial evidence standard, the agency's findings of fact must be upheld unless the alien demonstrates that the evidence he presented not only supports a contrary conclusion, but *compels* it." *Al Yatim v. Mukasey*, --- F.3d ---, 2008 WL 2608963, at *2 (8th Cir. Jul. 3, 2008) (internal quotations and citation omitted) (alteration omitted).

"The Attorney General has discretion to grant asylum to . . . an alien who is unable or unwilling to return to [his] home country because of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Averianova v. Mukasey*, 509 F.3d 890, 895 (8th Cir. 2007) (quotation omitted); *see* 8 U.S.C. §§ 1101(a)(42)(A) and 1158(b)(1); 8 C.F.R. § 208.13. "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a). Therefore, while an applicant is not required to produce corroborating evidence, he must satisfy the trier of fact that his testimony is credible. A credibility determination is a finding of fact, and we should accept adverse credibility findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Singh v. Gonzales*, 495 F.3d 553, 556 (8th Cir. 2007). "The combination of an adverse credibility finding and a lack of corroborating evidence for the claim of persecution means that the applicant's claim fails, regardless of the reason for the alleged persecution." *Averianova*, 509 F.3d at 895 (internal quotation omitted). Further, a fact-finder "may base an adverse credibility finding on the implausibility of an alien's testimony, as long as" the IJ explains her reasons for disbelief. *Onsongo v. Gonzales*, 457 F.3d 849, 853 (8th Cir. 2006) (internal quotations omitted). Moreover, "[w]hile minor inconsistencies and omissions will not support an adverse credibility determination, inconsistencies or omissions that relate to the basis of persecution are not minor but are at the heart of the asylum claim." *Jalloh v. Orders of the Bd. of Immigration Appeals*, 423 F.3d 894, 898 (8th Cir. 2005) (quotation omitted). We conclude that because Redd failed to meet his burden of demonstrating his credibility based on the

inconsistencies and implausibility of his testimony and failed to provide corroborating evidence for his persecution claim, his claim for asylum fails.

Redd's testimony that he was at home on October 14, 2000, the night his wife was raped, conflicts with his wife's testimony that he was not at home that night and had not been in the home for at least a month prior to that date. He further testified that his wife's parents were in the home that night, yet his wife testified that her parents did not live with them and were not in the house that night. When given the opportunity to explain the differences in the testimony, Redd was unable to provide a satisfactory explanation. Redd also testified that he was not hurt while in custody, but the affidavit Redd offered from Roques claimed that Redd had been flogged for failing to cooperate with Gbollie.

Redd attempts to explain these inconsistencies by arguing that his wife's testimony was confusing and incomprehensible because of the trauma from the rape, and, thus, the IJ should not have considered her testimony in determining Redd's credibility. However, she clearly stated in her testimony, for example, that her parents were not in the home on the night of October 14, 2000. While not all of her testimony was completely coherent, the IJ was not required to disregard statements she made that clearly conflicted with Redd's testimony. Redd argues that Roques's statement that Redd was flogged simply reflected Roques's mistaken belief that he was flogged and was only a minor error. However, in a section entitled "Background on how I got to know Thomas G. Redd," the affidavit states unequivocally that "he (Redd) was flogged." These unexplained inconsistencies go to the heart of the asylum claim as they directly relate to Redd's claims of past persecution and, therefore, support the IJ's determination that Redd was not credible.

The IJ also provided sufficient reasons for her conclusion that portions of Redd's testimony were implausible. Redd testified that Roques gave him the Gbollie letter stating that Redd was "to be eliminated without delay." Redd testified that he carried the Gbollie letter with him, along with his passport, everywhere from

approximately December 2000 until he came to the United States in June 2003, even as he traveled through Liberia and passed through checkpoints staffed by representatives of the Charles Taylor government. We agree with the IJ that it seems contrary to common sense that Redd would carry a letter ordering his death, much less that he would be allowed to pass through government-staffed checkpoints repeatedly while carrying it. It is also implausible that the Charles Taylor government would allow him to leave Liberia using his own passport if the government actually wanted him killed.

Redd argues that in determining that certain parts of his story were implausible, the IJ ignored the record and engaged in "speculation." "We have in the past refused to disturb IJs' findings based on assessments of plausibility, even though such assessments must ultimately depend on the fact-finder's notions of common sense and life experience." *Chen v. Mukasey*, 510 F.3d 797, 802 (8th Cir. 2007) (collecting cases). "While in certain cases, we have disagreed with the IJ's assessments of plausibility, we have done so only where the IJ's finding was irrational or based on improper bias." *Id.* (citations omitted). Here, we cannot conclude that the IJ's determination that Redd's story of crossing multiple checkpoints with the Gbollie letter and leaving the country under his own name was irrational or based on improper bias. Therefore, we accept the IJ's adverse credibility determination because we conclude that no reasonable adjudicator would be compelled to conclude to the contrary.

Further, Redd failed to demonstrate that the evidence he provided corroborated his claims. In fact, the evidence he offered, including Roques's affidavit and the Gbollie letter, actually supports the IJ's adverse credibility finding because the allegedly corroborating evidence supports the conclusion that Redd's testimony was inconsistent and implausible. The allegedly corroborating evidence that is not inconsistent with his testimony offers insufficient independent evidence of past persecution. Therefore, we conclude that substantial evidence supports the determination that Redd did not offer sufficient corroborating evidence to support his

claim of past persecution.  Because the testimony was incredible and because there is no corroborating evidence for his claim, Redd's asylum claim fails.  *See Averianova*, 509 F.3d at 895.

Finally, even if we assumed that Redd was credible and that he had established past persecution, we would conclude that substantial evidence supports the IJ's determination that Redd had not adequately demonstrated a well-founded fear of future persecution and would deny his claim for asylum.  Generally, a demonstration of past persecution gives rise to a presumption of a well-founded fear of future persecution, 8 C.F.R. § 208.13(b)(1), which establishes eligibility for asylum, 8 U.S.C. § 1101(a)(42)(A).  However, this presumption may be rebutted upon a showing that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in [his] country of nationality."  8 C.F.R. § 208.13(b)(1)(i)(A); *see also Turay*, 405 F.3d at 667.  Here, we note that Charles Taylor has been removed from power in Liberia and is now on trial in The Hague for war crimes and crimes against humanity and that Redd does not present any evidence that the members of the Krahn tribe are currently being persecuted in Liberia.  Redd offers no evidence to demonstrate that, beyond general strife in Liberia, it would be dangerous for him, as a member of the Krahn tribe, to return now that the Charles Taylor government is no longer in control.  *See Kamara v. Gonzales*, 180 Fed. Appx. 623, 626-27 (8th Cir. 2006) (unpublished) (upholding IJ's determination that, because Charles Taylor was no longer in power, applicant's "fears were no more than fears of the general civil strife that affects all Liberians," which is "not a basis for granting asylum").

## III.  CONCLUSION

Accordingly, we deny Redd's petition for review.

_____

-8-