# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 08-1012

_____

|  |  |  |
|---|---|---|
| | * | |
| Mykola Mykolayevich | * | |
| Khrystotodorov; Oksana | * | |
| Khrystotodorova; Viktoriya | * | Petition for Review of an Order of |
| Khrystotodorova, | * | the Board of Immigration Appeals. |
| | * | |
| Petitioners, | * | |
| | * | [PUBLISHED] |
| v. | * | |
| | * | |
| | * | |
| Michael B. Mukasey, Attorney | * | |
| General of the United States, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted:  September 24, 2008
Filed:  December 29, 2008

_____

Before RILEY, HANSEN, and MELLOY, Circuit Judges.

_____

HANSEN, Circuit Judge.

Mykola Mykolayevich Khrystotodorov ("Mykola"), his wife Oksana, and his daughter Viktoriya (collectively, "the Petitioners") are citizens of the Ukraine who sought asylum, withholding of removal, and relief under the Convention Against

Torture ("CAT"), based on persecution on account of their Baptist religion. The Immigration Judge (IJ) denied their applications and refused to reopen the proceedings for the submission of additional evidence. The Board of Immigration Appeals (BIA) dismissed their appeal, and the Petitioners seek judicial review. We granted a temporary stay of removal and of voluntary departure, and now, having fully considered the claims, we deny the petition for review and dissolve the temporary stay order.

I.

Mykola and his family entered the United States in early December 1999 as nonimmigrant visitors with permission to remain in this country until January 9, 2000. They remained longer than authorized, and removal proceedings commenced on June 14, 2001. They admitted the allegations, conceded removability, and filed an application for asylum, withholding of relief, and relief under the CAT, asserting that they had suffered persecution in the Ukraine on the basis of their Baptist religion and that they have a well-founded fear of persecution on this basis if they are returned to the Ukraine. At a hearing before the IJ on October 30, 2002, Mykola testified that he and his family are citizens of the Ukraine and lived in the city of Izmayil. They became Baptists in 1996, and he asserted that as a result of their faith, they suffered persecution by members of the Ukranian National Assembly-Ukranian National Self Defence (UNA-UNSO), whom he described as hit-men for the ruling National Democratic Party. Mykola recounted four principal incidents.

First, in August 1998, his sister was attacked on account of her faith by classmates who were members of UNA-UNSO. Mykola was a crew member on a ship and away at sea at the time. Although the incident was reported to police, they took no action. Second, in September 1998, Mykola was walking in the market with his wife, sister, and brother-in-law when they were attacked by four members of UNA-UNSO, one of whom had attacked his sister the previous month. They punched

Mykola in the face, and he spent the night and the next day in bed, but the injury did not require significant medical treatment. Because the police had not responded to his sister's complaint the previous month, Mykola complained to the mayor about the incident. Mykola wrote two letters to the mayor with no meaningful response.

Third, Mykola described an incident at a rally on October 8, 1998. He and some other individuals who had been beaten by UNA-UNSO members decided to organize a rally to protest this abuse. They garnered support from local churches and other religious minorities, including Baptists, Jews, and Pentacostals, and a group of 150 to 200 people gathered across the street from the mayor's office in protest. Mykola said that they were interrupted when attacked by UNA-UNSO hit-men who arrived in a bus carrying batons and yelling, "Beat the Baptists!" (Petitioners' Add. at 7.) Mykola testified that he was hit in the face, kicked to the ground, and knocked unconscious, and that his injuries required him to stay at the local hospital, the Danube Basin Hospital, for nine days. He alleged that he suffered a concussion, a broken nose, and cuts that required stitches near his mouth and ear. He filed a report with the police and in turn was questioned by them about who had sponsored the demonstration and whether he was receiving help from the United States. No one was arrested in regard to this incident.

The fourth incident occurred on November 20, 1998. He returned home to find red paint on his gate warning him to get out of the Ukraine, and the family dog had been beaten to death. Mykola referenced other threats as well and some vandalism to his home. He and his wife and child left the Ukraine for the United States in December 1999. His parents still live in Izmayil. Mykola said his parents have had some windows broken in their house and that his mother had been fired from her job.

At the close of the October 30, 2002, hearing, the IJ indicated that further documentation was needed and continued the hearing, giving the parties an opportunity to obtain documentation of the October 1998 rally at Izmayil and Mykola's injuries.

(See R. at 633.) On November 14, 2003, the IJ heard further evidence and again continued the hearing, noting that the medical records were in conflict (id. at 722) and that there was no documentation to support a conclusion that the UNA-UNSO was tied to the government (id. at 719-20). The IJ continued the hearing yet again, pointedly informing Mykola that he was being given another "opportunity to dig around some more" to find documents to help his case. (Id. at 724.)

Following the final hearing in March 2004, after nearly 18 months of continued hearings and ample opportunity to submit exhibits, the IJ expressed unresolved credibility concerns with the case and concluded that the claims lacked adequate corroboration. The background country information submitted was plentiful, but it made no mention of the October 1998 rally or of any serious incident of this sort, although more minor isolated incidents involving some discrimination, loss of jobs, and verbal harassment were reported. The IJ stated he was "at a loss to try to understand why the respondent has no corroborating evidence of such a major incident." (Petitioners' Add. at 22.) The IJ also noted that while a great deal of country background information was presented, it showed a lack of serious abuses of similarly situated people in general in the Ukraine, and the country background documents did not support Mykola's claim that the UNA-UNSO fighters were hit-men for the government.

Mykola offered some evidence of receiving medical treatment after the October 1998 incident to corroborate his claim. A note from the Danube Basin Hospital dated January 29, 2000, and signed by two doctors, certified that Mykola had been a patient at the hospital from October 8, 1998, to October 17, 1998, but the State Department's initial inquiry had found no records of his treatment at the Danube Basin Hospital. Also, the credibility of the hospital note was challenged with a letter from the director of the hospital, stating that Mykola did not apply for medical assistance at the hospital and that the signatures on the certificate he offered were not genuine. No other medical records verified his hospitalization, and he said that his family was recently told his

records had been lost. One document indicates that Mykola received outpatient stitches at a dental clinic for a cut wound on his lower lip in October 1998.

The IJ lamented the lack of corroboration, noting that if there had been undisputed medical evidence of a nine-day hospital stay clearly showing he was the victim of a mob attack by political extremists, "that would go a long way to support the respondent's claim. Unfortunately, the records don't go that far." (Id. at 23.) The IJ also noted that if there had been "satisfactory background documentation coupled with individualized information from the respondent that would corroborate that he actually was targeted by extremist groups in Izmayil, the Court would grant the case." (Id. at 24.) Because the IJ found a "significant variance" between Mykola's testimony and the information contained in the country background reports (id. at 25), and because of the lack of evidence corroborating Mykola's testimony, the IJ denied the applications for asylum, withholding of removal, and CAT relief and granted voluntary departure.

Approximately two weeks after the denial, the petitioners filed a motion to reopen the proceedings, offering evidence of a local news article reporting the October 8, 1998, rally incident. The article reported that members of UNA-UNSO had appeared on the scene and "trampled the peacefully [ ] gathered Christians who were carrying signs praising God." (Petitioners' App. at 42.) The article reported that the police were "[l]ate as usual," that they had not acted to avoid such conflicts, and that all of the seriously injured people were treated at municipal hospitals. (Id.) Mykola explained that his father had recently obtained the article from a fellow church member, and that he had not known earlier of this article's existence. The IJ denied the motion to reopen, concluding that the article was discoverable earlier and was therefore not "new evidence." The IJ also noted that it was not sufficient corroborating evidence to justify reopening the case.

Before the BIA, the Petitioners argued it was unfair for the IJ to indicate he would have granted the application if they had presented corroborating evidence of the

1998 demonstration and then to refuse to reopen the proceedings when presented with the evidence. The BIA stated that the Petitioners had not accurately characterized the IJ's decision and dismissed the appeal for essentially the same reasons as the IJ, concluding that there was "no clear error in the [IJ's] determination that the evidence was inconclusive due to conflicting documents." (Petitioners' Add. at 35.) The Petitioners now seek judicial review, challenging the IJ's credibility determination, the IJ's requirement of additional corroborating documentary evidence, and the denial of their motion to reopen.

## II.

Where the BIA has adopted the IJ's opinion and added reasoning and analysis of its own, we review both decisions. See Krasnopivtsev v. Ashcroft, 382 F.3d 832, 837 (8th Cir. 2004). We review the determination regarding eligibility for asylum, withholding of removal, and relief under the CAT for substantial evidence, which is an extremely deferential standard of review. Guled v. Mukasey, 515 F.3d 872, 879 (8th Cir. 2008). We will not disturb the IJ's "findings of fact 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Singh v. Gonzales, 495 F.3d 553, 556 (8th Cir. 2007) (quoting 8 U.S.C. § 1252(b)(4)(B), and noting that a change in the statutory language in 1996 did not work a material change to the substantial evidence standard of review).

The Attorney General has discretion to grant asylum to a refugee, 8 U.S.C. § 1158(b)(1)(A), and a refugee is a person unable or unwilling to return home "because of persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," id. § 1101(a)(42)(A). See Sow v. Mukasey, 546 F.3d 953, 955-56 (8th Cir. 2008). We will uphold a denial of asylum unless the applicant "demonstrates that the evidence he presented was so compelling that no reasonable fact finder could fail to find the

requisite fear of persecution." Eta-Ndu v. Gonzales, 411 F.3d 977, 982 (8th Cir. 2005) (internal marks omitted).

A request for withholding of removal is automatically included in an application for asylum. 8 C.F.R. § 1208.3(b). Withholding of removal is proper if the Attorney General decides that the applicant's life or freedom would be threatened in his home country because of his race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). This court has characterized the standard of proof for withholding of removal as more stringent than asylum because it requires a showing of "a clear probability" that the applicant will face persecution, rather than a well-founded fear. Eta-Ndu, 411 F.3d at 986 (internal marks omitted). Thus, where the applicant fails to demonstrate eligibility for asylum, he also fails to demonstrate the higher burden of proof for withholding of removal. Id.

Relief under the CAT requires the applicant to demonstrate "'that it is more likely than not that he or she would be tortured if returned to the proposed country of removal.'" Malonga v. Mukasey, 546 F.3d 546, 555-56 (8th Cir. 2008) (quoting 8 C.F.R. § 1208.16(c)(2)); see Hassen v. Mukasey, 534 F.3d 927, 930 (8th Cir. 2008) (citing 8 C.F.R. § 208.16(c)(2)). Eligibility for CAT relief requires a showing that the likely torture would be inflicted by a public official or instigated with the public official's consent. Miah v. Mukasey, 519 F.3d 784, 788 (8th Cir. 2008) (citing 8 C.F.R. § 1208.18(a)(1)). A government's "willful blindness toward the torture of citizens by third parties" amounts to unlawful acquiescence. Mouawad v. Gonzales, 485 F.3d 405, 413 (8th Cir. 2007) (internal marks omitted). This standard is more onerous than the standard for asylum and withholding of removal in that a likelihood of torture requires more than a well-founded fear of persecution; for example, torture is narrowly defined as an "act by which severe pain or suffering" is intentionally inflicted, 8 C.F.R. § 1208.18(a)(1), and this may encompass abuse that is more severe than persecution, see Mouawad, 485 F.3d at 413. However, this standard is less onerous in the sense that

there is no need to show fear of future harm on the basis of any statutorily defined ground.  Id.

## III.

The Petitioners challenge the IJ's findings regarding credibility and the need for additional corroborating evidence.  To establish eligibility for asylum or withholding of removal, a petitioner must demonstrate a well-founded fear of persecution that is "both subjectively genuine and objectively reasonable," Eta-Ndu, 411 F.3d at 983, and that fear must be established with evidence that is "credible, direct, and specific," id. at 984.  Credibility is a finding of fact that we review for substantial evidence.  Sow, 546 F.3d at 956.  "[T]he IJ and the BIA may require corroborative evidence where it is reasonable to expect corroboration."  Eta-Ndu, 411 F.3d at 984 (internal marks omitted).  Credibility and the need for corroboration are intertwined such that a denial of asylum based on a lack of corroboration must include an explicit ruling on the applicant's credibility, an explanation of why it is reasonable to expect additional corroboration, or an assessment of the sufficiency of the explanations for the absence of corroborating evidence.  Id.  We may not reverse the IJ's determination with respect to the availability of corroborating evidence unless a reasonable trier of fact would be compelled to conclude that the evidence is unavailable.  8 U.S.C. § 1252(b)(4).  The IJ's opinion articulated concerns with the overall credibility of Mykola's claim of past religious persecution and concluded that additional corroboration was lacking in three specific areas of concern central to the claims:  (1) general background evidence corroborating the persecution of Baptists by the UNA-UNSO and the group's tie to the government, (2) corroboration of the October 1998 rally violence, and (3) evidence to rehabilitate the medical documentation.

As to the first and second concerns, the IJ found that the significant variance between Mykola's testimony of violence and the country background reports, which did not mention similar violence against people similarly situated with the Petitioners,

required further corroboration. The record includes background information that details some isolated acts of discrimination against Baptists, Evangelical Christians and Jews, including loss of jobs or verbal harassment but not violence, and as a whole, the reports indicate that the Baptist religion is flourishing in the Ukraine. Glaringly absent from the country reports, as well as the religious-based reports submitted, is any mention of the October 1998 rally, a significant event as described by Mykola, although more minor isolated incidents were reported.[1] The background reports offered no corroboration of Mykola's assertion that the UNA-UNSO is supported by the controlling government. The reports identify the UNA-UNSO as a fascist organization that engages in threatening and harassing behavior, but there is no indication that the government condones their harassment or tolerates violence by the group. See Menjivar v. Gonzales, 416 F.3d 918, 921 (8th Cir. 2005) (stating eligibility requires proof of persecution by the government or an organization that the government is unable or unwilling to control or that the government either condones or is helpless to protect against). The record demonstrates that there were no widespread reports of violence by the group, although UNA-UNSO members have been involved in some protests against the government and have been arrested for some harassing activities such as stone throwing. The IJ concluded that the objective country background evidence did not support Mykola's view that the UNA-UNSO was connected to the government.

The IJ correctly considered the general country conditions as relevant to assessing Mykola's credibility because "an uncorroborated story that is at odds with what is known about country conditions is less likely to be accurate than one that is consistent with country conditions." Kondakova v. Ashcroft, 383 F.3d 792, 797 (8th Cir. 2004) (internal marks omitted), cert. denied, 543 U.S. 1053 (2005). Even though Mykola's version is plausible from his testimony, that fact does not compel a

---

[1]Because the IJ did not have the local news article before him when denying the claims for asylum and related relief, we will not consider it when reviewing the IJ's denial of relief. See Alanwoko v. Mukasey, 538 F.3d 908, 913 n.4 (8th Cir. 2008).

conclusion that the IJ erred. A reviewing court may not supersede an agency finding simply because an alternative finding could also be supported. Osongo v. Gonzales, 457 F.3d 849, 854 (8th Cir. 2006). We have remanded for additional findings where the BIA and IJ did not make an express credibility finding and did not provide "an analysis of what material facts central to the claim should have been reasonably corroborated," El-Sheikh v. Ashcroft, 388 F.3d 643, 648 (8th Cir. 2004), but this is not such a case. Here, substantial evidence supports the IJ's explanation that the objective evidence raised credibility concerns due to significant variances between Mykola's testimony and the objective information in the background country reports. The IJ provided an analysis indicating that violence against Baptists and other religious minorities at a significant rally and some indication that the assailants were either tied to the government or that the government was helpless to control the group would be expected to be reported at least in the religious reports. The IJ denied the claim after providing the Petitioners with ample opportunities to obtain some corroborating evidence and none was produced.

As to the third concern articulated by the IJ–the rehabilitation of the medical records–again, substantial evidence supports the IJ's decision to require corroborating evidence. Contrary to the Petitioners' assertion, the IJ did not ignore relevant evidence but expressed concern over the conflicts in the evidence. A statement from the director of the Danube Basin Hospital challenged the validity of the signatures on the statement that Mykola offered as certifying his nine-day hospital stay. The only other relevant medical evidence was a dental clinic record describing out-patient stitches for facial injuries on October 8, 1998, as a result of an "altercation with a man." (R. at 927.) The stitches were removed on October 17, 1998. A note certifies that Mykola was brought to the dental clinic at the direction of the hospital (Petitioners' App. at 47), but as the IJ noted, the dental record indicates out-patient treatment and does not corroborate Mykola's testimony of a nine-day hospital stay resulting from injuries sustained at the rally on October 8, 1998. The Petitioners' explanation that corroboration was not plausible because the hospital had recently informed them that Mykola's records had

been lost is unavailing. The IJ discounted this explanation, noting that, not only did they successfully obtain the dental record from 1998, they also obtained evidence of Mykola's routine merchant marine seaman's checkups at the Danube Basin Hospital since 1991, yet there was no record of the nine-day hospital stay. The Petitioners would have this court give more weight to the dental record and ignore the conflicting aspects of the alleged hospital stay, but we are not at liberty to reweigh the evidence. See Eta-Ndu, 411 F.3d at 983.

The Petitioners argue generally that Mykola's testimony alone is sufficient to sustain his burden of proof without further corroboration because the IJ did not identify inconsistencies within that testimony. Although our cases often cite to omissions, material inconsistencies, and unexplained discrepancies between the petitioner's own oral and written statements as supporting adverse credibility determinations or the need for additional corroboration, see Kondakova, 383 F.3d at 796, the IJ here identified three valid areas of discrepancies in the record, listed above, that went to the heart of the claims. These inconsistencies presented reasonable grounds for questioning Mykola's credibility and for requesting additional corroborative evidence. "'[I]f the trier of fact either does not believe the applicant *or does not know what to believe*, the applicant's failure to corroborate his [or her] testimony can be fatal to his [or her] asylum application.'" Id. (quoting Chebchoub v. INS, 257 F.3d 1038, 1042 (9th Cir. 2001)) (emphasis added and alterations in original). The IJ's decision was supported by substantial evidence, and the evidence on the record is not so compelling that no reasonable fact finder would be compelled to conclude otherwise. See 8 U.S.C. § 1252(b)(4)(B).[2]

---

[2]The REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 302, now provides specific criteria applicable to an IJ's credibility determination, codified at 8 U.S.C. § 1158(b)(1)(B)(iii) (2006); 8 U.S.C. § 1229a(c)(4)(C) (2006); and 8 U.S.C. § 1231(b)(3)(C) (2006). Those provisions, however, do not govern this case because they are applicable only in cases filed after May 11, 2005. See Chen v. Mukasey, 510 F.3d 797, 800-01 (8th Cir. 2007).

Because the Petitioners failed to establish eligibility for asylum, they necessarily cannot meet the more rigorous standard of proof for withholding of removal. Sow, 546 F.3d at 957; Eta-Ndu, 411 F.3d at 986. Also, contrary to the Petitioners' assertion, the IJ's failure to separately analyze their claim of relief under the CAT does not require remand in this case. We have instructed that "the IJ's adverse credibility determination and adverse decisions on asylum and withholding of removal are not determinative of the CAT claim." Sivakaran v. Ashcroft, 368 F.3d 1028, 1029 (8th Cir. 2004). However, "[a] separate analysis . . . is required only when there is evidence the alien may be tortured for reasons unrelated to his claims for asylum and withholding of removal." Guled, 515 F.3d at 882. Because the Petitioners rely on the same evidence for their CAT claims and have set forth no evidence to suggest that they are likely to be tortured for reasons unrelated to their religion, which was the basis for their asylum and withholding of removal claims, there is no need to remand.

Finally, the Petitioners argue that the IJ's refusal to reopen the proceedings to admit "new evidence" violated established precedent, as well as their due process rights. A motion to reopen may be granted on the basis of new facts that were material and not previously discoverable. 8 U.S.C. § 1229a(c)(7); see also 8 C.F.R. § 1003.23(b)(3). This requires a showing that the new evidence "could not by the exercise of due diligence have been discovered earlier." Fongwo v. Gonzales, 430 F.3d 944, 947 (8th Cir. 2005) (internal marks omitted). We review the IJ's denial of a motion to reopen for an abuse of discretion, id., mindful that the IJ "has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief," 8 C.F.R. § 1003.23(b)(3).

The IJ denied the Petitioners' motion to reopen concluding that the evidence they sought to admit–the local newspaper article about a rally in October 1998–was not "new evidence" because it was available well before the hearing. It was published on October 15, 1998, and could have been discovered earlier. Mykola offered the explanation that he did not know of its existence because his father had been searching

at the library for coverage in the prominent papers, and this article was published in a small local paper and given to his father after he asked church members for help. The IJ noted that the fact that the article was so readily produced when Mykola's father contacted church members (within approximately two weeks after the hearing) indicated it could have been discovered earlier. The BIA agreed with the IJ that the Petitioners' explanation for not finding this document earlier was unpersuasive and that in any event, the document provided only one piece of corroborating evidence in a record lacking corroboration in three critical areas.

We are not unsympathetic to the real difficulties a petitioner may face in obtaining corroboration for asylum and related claims, see Osongo, 457 F.3d at 855, but these Petitioners had nearly 18 months to find this article while the IJ continued the hearing again and again for this very purpose, and the article was quickly found when church members were asked. The Petitioners were on notice from the beginning that corroboration would be key to their case, and they cannot claim surprise at the decision indicating that adequate corroboration was lacking. They had been warned several times of its importance, yet evidently chose not to ask church members for help until after a final decision had been rendered. A motion to reopen is not designed to provide a second chance to bolster the record with evidence that could have been presented earlier. See Guled, 515 F.3d at 882; Fongwo, 430 F.3d at 947. We see no abuse of discretion in the IJ's denial of the motion to reopen.

To the extent the Petitioners raise a due process claim, they are "simply cloaking an abuse of discretion argument in constitutional garb." Sabhari v. Mukasey, 522 F.3d 842, 844 (8th Cir. 2008) (internal marks omitted). Furthermore, the Petitioners' assertion that the IJ "brutally and callously" refused to reopen the proceedings (Petitioners' Br. at 45) is a gross distortion of the record. Having determined that the IJ did not abuse his discretion by refusing to reopen, we are satisfied that the proceeding was not fundamentally unfair.

-13-

Accordingly, we deny the petition for judicial review and vacate the temporary stay order previously entered.

_____