# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1673

_____

Gerakl Pavlovich Chakhov

*Petitioner*

v.

Loretta E. Lynch, Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: May 16, 2016
Filed: September 14, 2016

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

Gerakl Pavlovich Chakhov petitions for review of an order of the Board of Immigration Appeals (Board or BIA) affirming an immigration judge's (IJ) denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). We deny the petition for review.

## I.    BACKGROUND

Russian national Chakhov entered the United States in September 2007 as a nonimmigrant visitor with authorization to remain in the United States until March 2008.  Approximately one month after entering the United States, Chakhov applied for asylum, withholding of removal, and CAT protection by submitting a Form I-589 to the United States Department of Homeland Security (DHS).  See 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 1208.16(c).  Chakhov, who was born in Georgia in 1964 and is of Greek and Russian descent, asserted he was afraid to return to Russia because he feared he would be subject to persecution by "skinhead-fascists" based on his non-Russian appearance.

On June 23, 2008, an asylum officer found Chakhov ineligible for asylum, determining the inconsistencies between Chakhov's interview with the officer and his application for asylum undermined his credibility in material respects.  DHS initiated removal proceedings against Chakhov in July 2008, ordering Chakhov to appear in immigration court.  At the initial hearing before an IJ on February 12, 2009, Chakhov admitted to the DHS's factual allegations, conceded removability, and indicated he would pursue his applications for asylum, withholding of removal, and CAT relief.

When Chakhov appeared before the IJ at another preliminary hearing in April 2010, he made 22 corrections to his Form I-589 and informed the IJ he wished to provide additional examples of mistreatment he suffered.  The IJ told Chakhov he should submit documents proving his ethnicity and medical records, and Chakhov, through a Russian-language interpreter, told the IJ the medical records "exist somewhere but nobody is going to give then [sic] to me."  Chakhov later submitted a supplemental affidavit dated June 16, 2010, that provided additional incidents of discrimination and abuse.

The hearing was continued until January 4, 2011.  Chakhov, again testifying by way of interpreter, described the discrimination he and his Russian-speaking

family experienced while growing up in the nation of Georgia in the 1970s. Chakhov said that in seventh grade he got into a fight with a classmate who had called Chakhov, "Russian bigot," and the classmate broke Chakhov's nose. In 1979, Chakhov moved to St. Petersburg and attended a medical technical college. After graduation, Chakhov was drafted into the Soviet Union Army, where he served from 1982 to 1984. Chakhov testified that in 1982, another soldier "lured [him] into a closed room" to "put [him] on [his] knees," but when Chakhov refused, the soldier started throwing logs from a furnace woodpile at Chakhov.

After finishing his military service, Chakhov eventually began working for the St. Petersburg police department, continuing for twelve and a half years. Chakhov claimed that while living in St. Petersburg, he was harmed and targeted because of his ethnicity. According to Chakhov, people were able to tell he was from Georgia due to his dark hair, crooked nose, and facial features that are supposedly distinctive to people from Georgia or the "southern Republics." For instance, Chakhov reported two men in 1988[1] "took [him] for somebody from Caucasus" and told him, "hey you, a black guy" and started beating him. Chakhov said in June 1990, he was approached on his way to work when someone yelled "hey you the black guy" and attacked and beat him, resulting in a concussion and kidney injury requiring Chakhov to spend one month in the hospital recovering from his injuries. Chakhov also described that in November of 1998 he was attacked by four people with leather jackets, boots, and shaved heads—one carried a baseball bat. Chakhov claimed he spent another month in the hospital recovering from that attack, which further injured his right kidney.

Chakhov also testified about a visit to Georgia in 2000. He stated that while he was there, his bag was stolen and he was accused of being a Russian spy.

---

[1]During his testimony at the hearing, Chakhov initially stated this incident occurred in 1980, but later indicated it happened in 1988. In recounting Chakhov's testimony in their briefs, the parties refer to the event as occurring in 1988.

Chakhov reported that he was detained, interrogated, and hit in the chest and in the face by Georgian police. When he returned to Russia, the police "threaten[ed] [him] with a machine gun" at the border and "extorted money" from Chakhov in exchange for permitting him to return home. Chakhov testified he was "very afraid" to return to Russia because of "skinheads," "fascists," and, "not to such [a] degree as the Nazis[,] . . . police."

On May 1, 2013, the IJ issued an order denying Chakhov's applications and ordering his removal. Taking into account "the rationality, internal consistency, and inherent persuasiveness" of Chakhov's claim, the IJ found Chakhov was "not credible based on inconsistencies and lack of corroborating evidence to support his claims of persecution in Russia." Chakhov appealed the decision to the Board, and the Board dismissed his appeal. Chakhov submitted a petition for review. On March 3, 2014, the government moved to remand the case "to clarify . . . to what extent an [IJ] may incorporate or weigh an asylum officer's adverse credibility determination when the application is renewed in removal proceedings." We granted the unopposed motion and remanded the order.

On March 4, 2015, the Board issued its decision again dismissing Chakhov's petition. The Board determined the IJ had not deferred to the asylum officer's credibility determination and concluded the IJ had "independently considered the totality of the evidence to conclude that the respondent was not a credible witness." Chakhov timely petitioned for review. See 8 U.S.C. § 1252 (jurisdiction).

## II. DISCUSSION

To demonstrate eligibility for asylum, the burden of proof is on the applicant to show that he is a refugee, see id. § 1158(b)(1)(B)(i), which requires the applicant to demonstrate that he "is unable or unwilling to" return to the country of the applicant's nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or

-4-

political opinion," id. § 1101(42). The burden may be satisfied through the applicant's testimony, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." Id. § 1158(b)(1)(B)(ii). Corroborating evidence may be required to bolster otherwise credible testimony "unless the applicant does not have the evidence and cannot reasonably obtain the evidence." Id.

We review the Board's "determination that an alien is not eligible for asylum, withholding of removal, or relief under the Convention Against Torture using the deferential substantial evidence standard." Osonowo v. Mukasey, 521 F.3d 922, 927 (8th Cir. 2008). "We review the BIA's decision, as it is the final agency decision; however, to the extent that the BIA adopted the findings or the reasoning of the IJ, we also review the IJ's decision as part of the final agency action." Davila-Mejia v. Mukasey, 531 F.3d 624, 627 (8th Cir. 2008).

Chakhov argues that the Board and IJ erred in making their credibility determination. We afford credibility findings from the IJ "much weight because the IJ sees the witness testify and is therefore in the best position to determine his or her credibility." Fofanah v. Gonzales, 447 F.3d 1037, 1040 (8th Cir. 2006). The IJ "may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency" and "internal consistency" of the applicant's "written and oral statements," "and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." 18 U.S.C. § 1158(b)(1)(B)(iii). The IJ's reasoning must "be convincing enough that a reasonable adjudicator would not be compelled to reach the contrary conclusion." Singh v. Gonzales, 495 F.3d 553, 558 (8th Cir. 2007).

Here, the IJ noted several discrepancies between Chakhov's application for asylum, his interview with the asylum officer, and his later testimony. The IJ began her credibility discussion by describing the inconsistencies the asylum officer reported after reviewing Chakhov's application, including discrepancies relating to whether Chakhov and his wife were ever fired from their jobs due to ethnic persecution, the status of Chakhov's relationship with his wife, his police service, living in Georgia, and his non-Slavic appearance.

Chakhov argues the IJ merely repeated the asylum officer's findings without conducting her own de novo review of his applications. The Board decided "it was appropriate for the [IJ] to take note of the statements made to the Asylum Officer by the respondent when performing a de novo review of the record." The IJ did not "specifically disavow[] reliance on any credibility findings" contained in the asylum officer's assessment, cf. Krasnopivtsev v. Ashcroft, 382 F.3d 832, 837 (8th Cir. 2004), but the IJ did not merely adopt the asylum officer's findings. The IJ considered the record, including all of Chakhov's previous written and oral statements, and, specifically, Chakhov's testimony before the IJ. See 8 C.F.R. § 1003.42(c), (d). The IJ explained that Chakhov only described attacks occurring in 1990 and 1998 in his application and supplemental affidavit, but when he testified before the IJ, he described additional attacks he suffered in 1982 and 1988. When questioned at the hearing why he had not previously disclosed the 1988 attack earlier, Chakhov testified he might have thought the 1988 attack was less important because his injury was not severe.

Chakhov admits that, over the course of the proceedings, he "continued to provide additional examples of the mistreatment he suffered in the Soviet Union," but argues "'evolving' facts" alone do not provide an "adequate basis to find his testimony inconsistent" or "undermine the heart of his claim." But, in assessing an applicant's credibility, an IJ may take into account these types of inconsistencies or omissions. Cf. Ntangsi v. Holder, 554 F.3d 1142, 1147 (8th Cir. 2009)

("'Inconsistencies or omissions in an asylum application that relate to the basis of persecution are not minor but are at the heart of the asylum claim.'" (citation omitted) (quoting Esaka v. Ashcroft, 397 F.3d 1105, 1110 (8th Cir. 2005))). We agree with the Board that these inconsistencies "touch on the circumstances of [Chakhov's] persecution" and are "material to his application for asylum." Furthermore, Chakhov's explanation that "[i]n hindsight" he would have included these prior accounts if he had understood the REAL ID Act does not excuse his evolving claim. See REAL ID Act of 2005, Pub. L. No. 109-13; cf. Purwantono v. Gonzales, 498 F.3d 822, 824 (8th Cir. 2007).

Chakhov contends the IJ clearly erred by questioning his father's background and "[s]uggesting that this issue bears negatively on [his own] credibility." The IJ questioned Chakhov's account of his father's nationality, explaining she was "uncertain whether [Chakhov]'s father was a citizen or national of Greece or was merely of Greek descent," but did not question Chakhov's own descent or nationality. The Board "agree[d] with the [IJ] that the noted inconsistencies and omissions make it difficult to know what to believe regarding these claims." Given the IJ's broad discretion to weigh "all relevant factors" under the totality of the circumstances when making a credibility determination, we cannot say taking into account this unresolved discrepancy was unreasonable. See 8 U.S.C. § 1158(b)(1)(B)(iii).

Chakhov also challenges the IJ's finding that he provided insufficient corroborating evidence. Chakhov maintains the IJ erred by requiring Chakhov to obtain corroborating evidence when it was unreasonable to do so and by failing to explain why she rejected his proffered reason for the unavailability. See, e.g., Khrystotodorov v. Mukasey, 551 F.3d 775, 782 (8th Cir. 2008) ("A denial of asylum based on a lack of corroboration must include an explicit ruling on the applicant's credibility, an explanation of why it is reasonable to expect additional corroboration, or an assessment of the sufficiency of the explanations for the absence of

corroborating evidence."); see also Eta-Ndu v. Gonzales, 411 F.3d 977, 984 (8th Cir. 2005).

To corroborate his claims, Chakhov provided a medical report from Russia showing he was hospitalized from June 18, 1990, through July 17, 1990. According to the IJ, the report did not explain why Chakhov was being treated, why he was in the hospital, or any "account of [his] medical condition during that month." The IJ also seems to have doubted the validity of Chakhov's efforts to obtain police records documenting the attacks against him. Initially, Chakhov stated that even if the police had opened a record relating to the 1988 attack in St. Petersburg, "they probably closed it right away. And maybe they send it to archives." Later, when the IJ inquired why Chakhov was unable to submit additional documents in support of his claims, Chakhov told the IJ he had tried to, but "when [he] realized that nothing would come out of it, they would not open the case, they would not persecute [sic] any culprits, they would not do anything about it, I just realized that my efforts would be just fruitless. And that's it." In her written order, the IJ observed that, although Chakhov said the effort was "fruitless," he "did not say why the police department would not open his case." We agree with the Board's assessment that the IJ did not clearly err by finding Chakhov's explanation of why the records were unavailable was insufficient. See Khrystotodorov, 551 F.3d at 783-84 (affirming the IJ's decision to discount the asylum applicant's explanation of why providing corroboration was impossible); cf., e.g., Liu v. Holder, 575 F.3d 193, 198 (2d Cir. 2009) ("[W]hile we have sometimes remanded a case if the IJ failed to explain his reliance on a lack of corroborating evidence, the alien bears the ultimate burden of introducing such evidence without prompting from the IJ.").

In sum, the IJ identified, and the Board adopted, specific, cogent reasons for Chakhov's adverse credibility finding that were supported by substantial evidence. See Singh, 495 F.3d at 556, 558; Tebyasa v. Holder, 593 F.3d 707, 711 (8th Cir. 2010) (upholding an adverse credibility finding where "numerous inconsistencies,

some going to the heart of the claim, provide a specific, cogent reason to disbelieve [the applicant's] claim of persecution"). As Chakhov's applications for asylum, withholding of removal, and relief under the CAT "'were based upon the same discredited testimony,'" his other claims for relief also fail. See Singh v. Lynch, 803 F.3d 988, 993 (8th Cir. 2015) (quoting Fofanah, 447 F.3d at 1040); see also Khrystotodorov, 551 F.3d at 781-82 (discussing the different and more stringent standards of proof that apply to claims for withholding of removal and CAT relief).

## III. CONCLUSION

For all of these reasons, we deny the petition for review.

_____