# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 08-1530

_____

| | | |
|---|---|---|
| Josephine Kemunto Manani, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| | * | Petition for Review from the |
| v. | * | Board of Immigration Appeals. |
| | * | |
| Mark R. Filip,[1] Acting Attorney | * | |
| General, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: September 25, 2008
Filed: January 28, 2009

_____

Before WOLLMAN, SMITH and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Josephine Kemunto Manani, a native and citizen of Kenya, petitions for review of a decision of the Board of Immigration Appeals ("BIA") denying her application

_____

[1]Mark R. Filip became the Acting Attorney General on January 20, 2009, and is automatically substituted as respondent under Federal Rule of Appellate Procedure 43(c)(2).

for asylum, withholding of removal, and protection under Article 3 of the Convention Against Torture ("CAT").  To the extent that we have jurisdiction, we deny Manani's petition.

## I.    BACKGROUND

Manani entered the United States on or about October 18, 2001, as a nonimmigrant visitor with authorization to stay in this country until November 17, 2001.  On May 21, 2004, Manani filed an application for asylum, withholding of removal, and protection under Article 3 of the CAT.  Manani sought relief based on her membership in two social groups:  widowed Mkisii women subjected to "wife inheritance" and Kenyans who are HIV-positive.

Manani stated in her application that she is a member of the Mkisii ethnic or tribal group[2] and that she lived in Kisii, Kenya, before coming to the United States. Manani alleged that after her husband's death on August 3, 1999, her husband's three brothers began to harass her.  According to Manani, her husband's brothers sought to "inherit" her in accordance with the traditions of Mkisii culture.  This inheritance custom entails a forced marriage between the widow and one of her deceased husband's brothers.  The widow's new husband exercises control over her and her children and assumes ownership of the widow's property.  Although Manani refused to be inherited, her brothers-in-law allegedly stole property from her home and attempted to intimidate her.  Eventually, her deceased husband's family began demanding that Manani's daughters undergo female genital mutilation ("FGM"). Manani responded by sending her daughters away to boarding school.  Manani and her sons later left their home to move in with Manani's parents in Matutu, Kenya.

---

[2]Some documents in the record refer to the "Kisii" ethnic or tribal group.  For the sake of consistency, we follow the terminology used in the parties' briefs.

In October 2001, more than two years after her husband died, Manani came to the United States to attend a religious conference, leaving her sons behind in Kenya. Manani asserted that she received an extension of her nonimmigrant status that authorized her to stay in this country until March 4, 2002. Manani claimed that a few days before this extension was set to expire she broke her back and one of her legs in a fall down a flight of stairs. While recovering from surgery after this accident, Manani allegedly suffered a "massive" heart attack. Manani stated that she then had two additional surgical procedures and completed a lengthy rehabilitation program. Manani submitted a letter to corroborate her account of these catastrophic events, purportedly written by the director of the cardiovascular division at the Hospital of the University of Pennsylvania.

Manani reported that she filed another application for an extension of her nonimmigrant status in August 2002, which was denied in January 2003. Later that January, Manani was diagnosed with HIV. Manani wrote in her May 2004 application for asylum that she feared discrimination on account of her HIV-positive status if she were forced to return to Kenya.

The Department of Homeland Security's Chicago Asylum Office ("Asylum Office") declined to grant Manani's application for asylum because Manani failed to demonstrate by clear and convincing evidence that she filed her application within one year after her arrival in the United States. *See* 8 U.S.C. § 1158(a)(2)(B) (providing that an alien may not apply for asylum unless she "demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States"). The Asylum Office found that Manani showed "changed circumstances materially affecting [her] eligibility for asylum, or extraordinary circumstances directly related to [her] delay in filing," but nevertheless decided that Manani "failed to file [her] application within a reasonable period of time given those circumstances." *See* 8 U.S.C. § 1158(a)(2)(D) (providing that an untimely application "may be considered . . . if the alien demonstrates to the satisfaction of the

Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the [one-year] period specified in [8 U.S.C. § 1158(a)(2)(B)]"). The Asylum Office referred Manani's application to an immigration judge ("IJ") to commence removal proceedings.

On November 19, 2004, Manani made her initial appearance before the IJ. Manani conceded that she was removable under 8 U.S.C. § 1227(a)(1)(B) for remaining in the United States after November 17, 2001, without authorization. The IJ continued the proceedings until January 12, 2006. On that date, Manani reiterated many of the factual allegations set forth in her written application for asylum, withholding of removal, and protection under the CAT. Manani admitted, however, that her narrative about falling down a flight of stairs and suffering a heart attack was a fabrication. Manani also confessed that the letter she submitted to corroborate her fantastic account of those events was a forgery. On April 27, 2006, the IJ heard testimony from Manani's sons, who joined their mother in the United States in August 2004, and from Manani's clinical psychologist. The IJ then issued her oral decision.

The IJ found that Manani's testimony was partly credible and partly exaggerated. The IJ credited Manani's testimony that her husband died in 1999, that her brothers-in-law desired to inherit her and subject her daughters to FGM, and that she subjectively feared returning to Kenya because of her HIV-positive status. On the other hand, the IJ discredited Manani's inconsistent testimony about whether her brothers-in-law had physically harmed her after her husband's death. Moreover, the IJ decided that Manani exaggerated her claims about the threat of future harm to her and her daughters from her brothers-in-law and their family. The IJ noted in this regard that Manani avoided wife inheritance during the roughly two-year period between her husband's death and her arrival in the United States and that her daughters avoided FGM despite remaining in Kenya without their mother. The IJ also

-4-

registered concerns regarding Manani's credibility in light of her fabricated narrative about suffering life-threatening injuries and her submission of a forged letter.

While the IJ stated that Manani failed to meet her burden of proof on the merits of her asylum claim, the IJ later held that Manani was statutorily ineligible for asylum because she did not file her application within one year after her arrival in the United States. The IJ further held that Manani's May 2004 application for asylum was not filed within a reasonable time after learning that she was HIV-positive in January 2003. The IJ added that she would, in any event, deny Manani's application for asylum as a matter of discretion because of Manani's submission of a fraudulent document. Finally, the IJ determined that Manani's failure to meet the lower burden of proof associated with her asylum claim meant that she necessarily failed to meet the higher burden of proof required to establish her eligibility for withholding of removal or protection under the CAT.

Manani appealed to the BIA, arguing, among other things, that the evidence conclusively showed that she suffered past persecution in Kenya and that she had a well-founded fear of future persecution if she were forced to return there. Manani continued to describe herself as a member of the social group composed of Kenyans who are HIV-positive, but she both broadened and narrowed her description of the other social group to which she claimed membership; that is, Manani now described herself as a *Kenyan* (rather than *Mkisii*) widow *opposed* (rather than *subjected*) to wife inheritance *and to the performance of FGM on her daughters* (a new category).

On February 20, 2008, the BIA dismissed Manani's appeal in its entirety. First, the BIA affirmed the IJ's decision insofar as it found Manani statutorily ineligible for asylum because she did not file her application within either one year after she entered the United States in October 2001 or a reasonable time after she learned that she was HIV-positive in January 2003. The BIA rejected Manani's argument that the IJ ignored testimony from Manani's psychologist indicating that Manani experienced

symptoms of severe depression before she was diagnosed with HIV. The BIA noted that Manani was able to start working as a caregiver in April 2003, more than a full year before filing her application for asylum on May 21, 2004. Thus, the BIA held that "even considering [Manani's] depression," she nonetheless failed to file her application "within a reasonable period."

Turning to Manani's remaining claims, the BIA found no clear error in the IJ's determination that Manani was only partly credible. The BIA recounted the "discrepancies" in Manani's testimony about whether she suffered physical harm at the hands of her brothers-in-law. In addition, the BIA relied on "all the reasons identified by the [IJ]," which would presumably include the IJ's concerns regarding Manani's fabricated narrative about suffering life-threatening injuries and her submission of a forged letter.

On the merits, the BIA agreed with the IJ's conclusion that Manani failed to establish her eligibility for withholding of removal or protection under the CAT. The BIA echoed the IJ in noting that Manani avoided wife inheritance during the roughly two-year period between her husband's death and her arrival in the United States and that her daughters avoided FGM despite remaining in Kenya without their mother. As a result, the BIA held that Manani did not meet her burden to show either past persecution or a clear probability of future persecution on account of her status as a Kenyan widow opposed to wife inheritance and to the performance of FGM on her daughters. Though the BIA acknowledged that Manani might face discrimination in Kenya on account of her HIV-positive status, it found that Manani had not established that the potential discrimination would rise to the level of persecution or that her life or freedom would be threatened because of economic hardship. In dismissing Manani's CAT claim, the BIA noted that Manani did not allege that she would be tortured by or with the acquiescence of the Kenyan government if she returned to her country of origin.

On March 7, 2008, Manani filed a timely petition for review of the BIA's removal order. *See* 8 U.S.C. § 1252(b). Manani argues that the denial of her application for asylum, withholding of removal, and protection under the CAT was erroneous in numerous respects.

## II. DISCUSSION

Before addressing the merits of Manani's claims, we must first decide the limits of our jurisdiction. Congress has generally precluded the federal courts from exercising jurisdiction to review a determination of the Attorney General that an application for asylum was untimely. *See* 8 U.S.C. § 1158(a)(3). Accordingly, the Government contends that we lack jurisdiction to review the BIA's determination that Manani was statutorily ineligible for asylum because she did not file her application within either one year after her arrival in the United States or a reasonable time after the onset of any changed or extraordinary circumstances. There is, however, a limited exception to the jurisdictional bar established in § 1158(a)(3). Namely, 8 U.S.C. § 1252(a)(2)(D), enacted as part of the REAL ID Act of 2005, provides that § 1158(a)(3) shall not "be construed as precluding review of *constitutional claims* or *questions of law* raised upon a petition for review filed with an appropriate court of appeals." (Emphasis added.) We must, therefore, examine "the nature of the argument advanced in the petition to determine whether an alien is raising a constitutional claim or question of law, over which we have jurisdiction, or asserting a dispute with the BIA's factual findings or discretionary judgments, which are insulated from judicial review." *Purwantono v. Gonzales*, 498 F.3d 822, 824 (8th Cir. 2007).

Manani's principal argument concerning the timeliness of her application for asylum is that the BIA should have found that her "mental and physical health" prevented her from seeking asylum until May 21, 2004, a date more than two and a half years after she arrived in the United States and nearly sixteen months after she

-7-

learned that she was HIV-positive. Manani's contentions in this vein do not raise any "colorable constitutional challenges or questions of law," *Mouawad v. Gonzales*, 485 F.3d 405, 411 (8th Cir. 2007), but instead "amount to a quarrel with the BIA's discretionary factual determination," *Purwantono*, 498 F.3d at 824. Consequently, we lack jurisdiction to review the BIA's determination that Manani was statutorily ineligible for asylum.[3] *See id.*

Manani argues, in the alternative, that enforcing the one-year time limit on filing an application for asylum is inconsistent with U.S. obligations as a signatory to the United Nations Convention Relating to the Status of Refugees. Although this argument presents a question of law under § 1252(a)(2)(D), we may not consider it

---

[3]Manani's recitation of the term "due process" in the "Statement of the Issues" section of her brief does not convert her attack on the BIA's exercise of discretion into a colorable constitutional claim. *See, e.g.*, *Meraz-Reyes v. Gonzales*, 436 F.3d 842, 843 (8th Cir. 2006) (per curiam) ("[A] petitioner may not create the jurisdiction that Congress chose to remove simply by cloaking an abuse of discretion argument in constitutional garb." (alteration in original) (quoting *Onyinkwa v. Ashcroft*, 376 F.3d 797, 799 n.1 (8th Cir. 2004))). Manani's bare citation to *Gjyzi v. Ashcroft*, 386 F.3d 710 (6th Cir. 2004), a case in which the BIA's determination lacked any "actual or divinable reasoned basis," *id.* at 714, is equally unavailing.

because Manani failed to raise the issue before the BIA.[4]  *See Ming Ming Wijono v. Gonzales*, 439 F.3d 868, 871 (8th Cir. 2006).

The remainder of Manani's petition relates to the BIA's denial of her application for withholding of removal and protection under the CAT, which we have jurisdiction to consider.  To establish her eligibility for withholding of removal under 8 U.S.C. § 1231(b)(3), Manani bore the burden of showing "a clear probability" that "her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 C.F.R. § 1208.16(b); *see also Ezeagwu v. Mukasey*, 537 F.3d 836, 839 (8th Cir. 2008).  An applicant meets this standard if "she shows past persecution based on one of the protected grounds (thus creating a rebuttable presumption of a future threat to life [or] freedom), or that future persecution 'is more likely than not' to occur if the applicant is forced to return to . . . her home country." *Ezeagwu*, 537 F.3d at 839 (quoting 8 C.F.R. § 1208.16(b)(1)-(2) and citing *Mouawad*, 485 F.3d at 411-12).  To establish her eligibility for protection under the CAT, Manani bore the burden of showing that it is "more likely than not" that "she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c); *see also Ezeagwu*, 537 F.3d at 839.

---

[4]We need not address the conflict in this circuit's precedents about "whether the failure to raise an *issue* before the BIA is a jurisdictionally-fatal failure to exhaust an administrative *remedy* . . . [under] 8 U.S.C. § 1252(d)(1)" or if it "simply raises the non-jurisdictional question whether review of that issue is precluded by the doctrine of administrative exhaustion." *Zine v. Mukasey*, 517 F.3d 535, 539-40 (8th Cir. 2008). Even if we assume that Manani's failure to exhaust this issue is non-jurisdictional, we see no reason why an exception to the issue exhaustion requirement would be warranted here.  *Cf. Etchu-Njang v. Gonzales*, 403 F.3d 577, 584 (8th Cir. 2005) ("Assuming for the sake of argument that there may be exceptions to the issue exhaustion requirement, we do not agree that an exception could be justified in this case.").

Because the BIA "adopt[ed] the IJ's reasoning in relevant part," we will consider both opinions. *Rafiyev v. Mukasey*, 536 F.3d 853, 856 (8th Cir. 2008). We review the administrative findings of fact, including credibility determinations, under a substantial evidence standard. *Singh v. Gonzales*, 495 F.3d 553, 556 (8th Cir. 2007). These findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

At the outset, we may dispose of Manani's claim that she established past persecution on account of her membership in a social group composed of Mkissi women who have been forcibly subjected to FGM. While Manani stated in her application for asylum that she was "circumcised" as a child and testified before the IJ that FGM is a "very, very painful" procedure, she did not introduce her personal trauma as an affirmative claim for relief. Instead, in her written application, in her testimony and in her administrative appeal, Manani described this childhood experience to explain why she opposed the alleged efforts by her brothers-in-law to subject her daughters to FGM. Here again, this court may not consider an issue that Manani failed to raise before the BIA.[5] *See Ming Ming Wijono*, 439 F.3d at 871.

We turn at last to the merits of Manani's remaining claims. Manani argued before the BIA that she was entitled to withholding of removal based on her membership in two social groups: (1) Kenyan widows opposed to wife inheritance and to the performance of FGM on their daughters; and (2) Kenyans who are HIV-

---

[5]Shortly before we heard oral argument, Manani's attorney submitted a letter to inform the panel that Manani's childhood experience of FGM has been raised in a motion to reopen that she filed with the BIA. Our review is confined, of course, to the present administrative record, *see* 8 U.S.C. § 1252(b)(4)(A), which reveals that this issue has not yet been exhausted. Notwithstanding the letter from Manani's attorney, we are not aware of any authority that would permit us to preemptively consider a claim that remains pending before the BIA.

positive.  Substantial evidence supports the BIA's denial of Manani's application for withholding of removal on both of these grounds.

The BIA's consideration of Manani's claims concerning past and future persecution on account of her status as a Kenyan widow turned, in part, on the IJ's adverse credibility determination.  We have recognized that "[w]hile minor inconsistencies and omissions will not support an adverse credibility determination, inconsistencies or omissions that relate to the basis of persecution are not minor but are at the heart of the asylum claim."[6]  *Redd v. Mukasey*, 535 F.3d 838, 842 (8th Cir. 2008) (alteration in original) (quoting *Jalloh v. Gonzales*, 423 F.3d 894, 898 (8th Cir. 2005)).  We have also held that an adverse credibility determination may be premised "on the applicant's submission of fraudulent documents, if [she] . . . fails to offer a legitimate explanation for the suspected fraud."  *Rafiyev*, 536 F.3d at 856 (citing *Onsongo v. Gonzales*, 457 F.3d 849, 854 (8th Cir. 2006)).  Although Manani's petition does not squarely confront the IJ's finding that she was only partly credible, our independent review of the record shows that the IJ gave an adequate explanation for her adverse credibility determination and that a reasonable adjudicator would not be compelled to reach a contrary conclusion.  *See Singh*, 495 F.3d at 557-58.

In particular, the IJ and the BIA described Manani's inconsistent testimony about whether her brothers-in-law had physically harmed her after her husband's death.  At first, Manani testified that her brothers-in-law merely "grabbed" and "squeezed" her hand and that they did not do anything else to cause her physical harm.  Later, Manani testified that her brothers-in-law slapped her and that she remembered

---

[6]The REAL ID Act included a provision, codified at 8 U.S.C. § 1158(b)(1)(B)(iii), that permits triers of fact to make credibility determinations "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim."  *See Singh*, 495 F.3d at 556 n.1.  Because Manani filed her application before May 11, 2005, the effective date of that provision, the new standard does not apply.  *See id.*

being slapped on only one occasion. Manani went on to testify, however, that her brothers-in-law slapped her "several times," but she could not remember whether she was slapped on two occasions or more than two occasions. The IJ gave Manani an opportunity to reconcile the inconsistencies in her testimony. Manani failed, however, to provide any details about the alleged confrontations with her brothers-in-law, except that the first confrontation happened a month after her husband's death and that "problems" recurred, "on and off," for an indefinite length of time afterwards. Because these unexplained inconsistencies go to the heart of Manani's claims concerning past and future persecution on account of her status as a Kenyan widow, we hold that they support the IJ's finding that Manani was only partly credible. *See Redd*, 535 F.3d at 842.

The IJ identified several additional reasons for her adverse credibility determination, which the BIA adopted without further comment. The most prominent among these was Manani's fabricated narrative about suffering life-threatening injuries and her submission of a forged letter to corroborate that account. While Manani eventually came forward to admit that she had been untruthful, the IJ found that her proffered explanation was unpersuasive. We will not set aside the IJ's conclusion that Manani's attempt to perpetrate a fraud on the immigration process cast doubt upon the veracity of her other allegations.

Apart from her diminished credibility, the BIA noted two critical facts that further undermined Manani's asserted fear of future persecution on account of her status as a Kenyan widow opposed to wife inheritance and to the performance of FGM on her daughters. First, Manani was able to avoid wife inheritance during the roughly two-year period between her husband's death and her arrival in the United States. Second, Manani's daughters were able to avoid FGM despite remaining in Kenya without their mother. In view of these facts, we are not convinced that any reasonable adjudicator would be compelled to find that Manani met her burden of showing a clear probability that her life or freedom would be threatened by her brothers-in-law (or

-12-

other aggrieved members of the Mkisii ethnic or tribal group), who lacked either the will or the ability to carry out their previous threats. After considering the record as a whole, we conclude that substantial evidence supports the BIA's denial of Manani's application for withholding of removal insofar as it related to her membership in the social group composed of Kenyan widows opposed to wife inheritance and to the performance of FGM on their daughters.[7]

The BIA's consideration of Manani's claim concerning future persecution on account of her HIV-positive status focused on objective evidence about conditions in Kenya. The BIA agreed with the IJ's determination that treatment for HIV/AIDS is available in Kenya and that mandatory testing for HIV as a prerequisite for employment is illegal. Therefore, the BIA held that Manani failed to establish that it is more likely than not that her life or freedom would be threatened on this basis if she were removed to Kenya. *See Makatengkeng v. Gonzales*, 495 F.3d 876, 883 (8th Cir. 2007) (noting that this court has generally "continued to require a showing that allegations of economic hardship threaten the petitioner's life or freedom in order to rise to the level of persecution").

---

[7]Our recent decision in *Ngengwe v. Mukasey*, 543 F.3d 1029 (8th Cir. 2008), is not to the contrary. There, we held that the BIA erred in rejecting a petitioner's proposed social group, "Cameroonian widows." *Id.* at 1034. We also identified serious flaws in several other components of the BIA's decision, including its failure to adequately consider probative evidence that supported the petitioner's claims concerning her exposure to violent and confiscatory Cameroonian mourning rituals. *Id.* at 1035-38. Manani has not established that the BIA's consideration of the evidence in this case exhibited similar deficiencies. Moreover, the IJ in *Ngengwe* credited the petitioner's testimony about suffering severe physical and non-physical harm inflicted by her deceased husband's family. *Id.* at 1031-32, 1035-36. Here, by contrast, the BIA accepted the IJ's determination that Manani's testimony relating to her wife inheritance claim was partly exaggerated and only partly credible.

To be sure, HIV is a debilitating and often fatal disease if left untreated.  But Manani has not shown a clear probability that the Kenyan government, or private actors that the Kenyan government is unable or unwilling to control, would deliberately deprive her of access to life-saving medical care.  *See Ngengwe*, 543 F.3d at 1036.  Nor has Manani shown that any inadequacies in Kenya's health care system result from an effort to persecute persons diagnosed with HIV.  *See Ixtlilco-Morales v. Keisler*, 507 F.3d 651, 655-56 (8th Cir. 2007).  After considering the record as a whole, we conclude that substantial evidence supports the BIA's denial of Manani's application for withholding of removal insofar as it related to her membership in the social group composed of Kenyans who are HIV-positive.

Finally, Manani argues that the BIA erred in denying her application for protection under the CAT without conducting a separate analysis of that claim.  Manani's argument is factually incorrect:  the BIA's opinion includes a paragraph in which the BIA separately considered Manani's CAT claim.  This analysis was brief, however, because Manani failed to allege that she would be tortured by or with the acquiescence of the Kenyan government if she returned to her country of origin.[8]  Manani's argument is also legally incorrect.  Because Manani did not present any evidence that she might be tortured for reasons unrelated to her claims for asylum and withholding of removal, the BIA was not required to conduct a separate analysis of her claim for protection under Article 3 of the CAT.  *See, e.g.*, *Abdelwase v. Gonzales*, 496 F.3d 904, 908 (8th Cir. 2007).

---

[8]Manani makes a similar mistake in her petition to this court, treating persecution and torture as interchangeable terms.  *Cf. Samedov v. Gonzales*, 422 F.3d 704, 708 (8th Cir. 2005) (noting that "[t]orture . . . is not coterminous with persecution").

-14-

## III. CONCLUSION

For the foregoing reasons, we deny Manani's petition for review.

_____