# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1224

_____

Rose Mambwe,

      Petitioner,

v.

Eric H. Holder, Jr.,[1] Attorney
General of the United States,

      Respondent.

Petition for Review from the
Board of Immigration Appeals.

_____

Submitted: February 11, 2009
Filed: July 16, 2009

_____

Before BYE, JOHN R. GIBSON and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Rose Mambwe, a native and citizen of Angola, petitions for review of a decision of the Board of Immigration Appeals ("BIA") denying her application for asylum, withholding of removal, and protection under Article 3 of the Convention Against Torture ("CAT"). For the following reasons, we deny Mambwe's petition.

_____

[1]Eric H. Holder, Jr., became the Attorney General on February 3, 2009, and is automatically substituted as respondent under Rule 43(c)(2) of the Federal Rules of Appellate Procedure.

## I.    BACKGROUND

Mambwe entered the United States on or about June 10, 2000, as a nonimmigrant visitor with authorization to stay in this country until December 9, 2000.  Although Mambwe is a citizen of Angola, she entered the United States using a Zambian passport, which she has since admitted was obtained by fraud.  On September 25, 2000, Mambwe filed an application for asylum, withholding of removal, and protection under Article 3 of the CAT.

The former Immigration and Naturalization Service determined that Mambwe was not eligible for asylum and referred her application to an immigration judge ("IJ") to commence removal proceedings.  In her master calendar hearing before the IJ, Mambwe admitted that she was removable under 8 U.S.C. § 1227(a)(1)(B) for remaining in the United States after December 9, 2000, without authorization. Mambwe sought relief based on allegations that she suffered past persecution in her native country of Angola as well as in Zambia, where she lived for more than fifteen years as a refugee.  We have drawn the following narrative of events leading up to Mambwe's arrival in the United States from her testimony before the IJ, supplemented in places with details that appear only in her written application.

Mambwe was born in Lewa, Angola, on October 10, 1979.  At the time, Angola was in the midst of a civil war between the Popular Movement for the Liberation of Angola ("MPLA") and the National Union for the Total Independence of Angola ("UNITA"), which would last for another twenty-three years.  Mambwe reports that her ethnic or tribal group, the Mbundu, was known to be "aligned" with the MPLA.

In 1984, UNITA forces attacked Mambwe's village.  Mambwe has not heard from her father or brothers since the attack, so she presumes that they were either conscripted into UNITA's military or killed.  Mambwe and her mother fled Angola

and eventually settled in the Meheba Refugee Camp near Solwezi, Zambia.  Three years later, Mambwe's mother went to Angola to search for the rest of her family, leaving Mambwe in the care of a friend.  Mambwe's mother never returned.

In 1991, Mambwe was raped by persons who she describes as "boys from the refugee camp."  Soon thereafter, Mambwe learned that she was pregnant.  On January 28, 1992, Mambwe gave birth to a daughter, Norah.  Hoping to continue her schooling, Mambwe left Norah in the care of a Pentecostal minister named Tony Choni and went to live with two members of Choni's church, Matthew and Paula Chishemba, whom she calls foster parents.  Mambwe's foster parents did not permit her to go to school; instead, they forced her to work on their farm in Zambezi, Zambia, and sometimes physically abused her.  At some point in 1993, Mambwe ran away from her foster parents' farm and returned to Meheba, where she spent the next four years enrolled in the Meheba Secondary School for Refugees.  After graduating from secondary school in 1997, Mambwe moved back to the farm.

In December 1997, Zambezi was attacked by a group of eight to ten men.  Mambwe identified the attackers as members of UNITA's military because they were wearing camouflage pants and speaking languages that are common in Angola but rare in Zambia.  During the attack, the UNITA soldiers decapitated Matthew Chishemba and cut off Paula Chishemba's hands.  The soldiers then kidnapped Mambwe and took her across the border into Angola.  Mambwe was held captive, along with several other women from Angola and Zambia, for two to three weeks.  During that time, Mambwe was repeatedly raped and beaten.  Mambwe and the other captives finally managed to escape into Zambia with the help of one of the soldiers.

Mambwe returned to Meheba once more, this time to live with Tony Choni and her daughter Norah.  When Choni was transferred to Kitwe, Zambia, in early 1998, Mambwe went with him.  Mambwe spent the next two years living in Kitwe with Norah, Choni, and Choni's wife, Christine.  According to Mambwe, Choni made

arrangements for her to travel to the United States in June 2000 using a Zambian passport that he acquired by falsely identifying Mambwe as a native and citizen of Zambia. Mambwe testified that when she left Zambia on or about June 8, 2000, she intended to stay in the United States.

The IJ denied Mambwe's application for asylum, withholding of removal, and protection under Article 3 of the CAT. After summarizing Mambwe's version of the facts and many of the documents contained in the administrative record, the IJ noted that there was "conflicting evidence" concerning Mambwe's credibility. Notwithstanding several potential red flags in the record, the IJ found that Mambwe's testimony was "generally credible." On the merits of Mambwe's claim for asylum, the IJ found that Mambwe met her initial burden by proving that UNITA's attack on her village in 1984 constituted past persecution on account of a protected ground. Although this meant that Mambwe was presumed to have a well-founded fear of future persecution in Angola, the IJ found that the Department of Homeland Security ("DHS")[2] rebutted the presumption by proving that there had been a fundamental change in circumstances in Angola: namely, the end of the civil war between the MPLA and UNITA in 2002. The IJ went on to find that the 1984 attack did not rise to the level of severity required to support a grant of "humanitarian asylum" in the absence of a well-founded fear of future persecution and that Mambwe was not eligible for asylum based on the other incidents that she described—the rape perpetrated by "boys from the refugee camp" in 1991 and the attack and kidnapping carried out by UNITA soldiers in 1997—because they did not involve persecution on account of Mambwe's race, religion, nationality, membership in a particular social group, or political opinion. Having denied Mambwe's claim for asylum, the IJ held that Mambwe failed to meet the higher burden of proof required to establish her eligibility for withholding of removal. Finally, the IJ found that Mambwe did not

[2]The former Immigration and Naturalization Service ceased to exist on March 1, 2003, and its functions were transferred to the DHS. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.

qualify for protection under the CAT because she failed to present any evidence tending to show that she would be tortured by or with the acquiescence of the Angolan government if she returned to Angola.

Mambwe appealed to the BIA, arguing that she suffered past persecution in Angola and Zambia, that changed conditions in Angola did not negate her fear of future persecution, and that even if she lacked a well-founded fear of future persecution she would still merit humanitarian relief. The BIA dismissed Mambwe's appeal in its entirety. First, the BIA agreed that Mambwe suffered past persecution in Angola, noting that the DHS had not challenged the IJ's finding that Mambwe met her initial burden by proving that UNITA's attack on her village in 1984 constituted past persecution on account of a protected ground. But the BIA found no clear error in the IJ's conclusion that the end of the civil war between the MPLA and UNITA in 2002 amounted to a fundamental change in circumstances that rebutted the presumption that Mambwe had a well-founded fear of future persecution in Angola. The BIA went on to hold that Mambwe was not eligible for humanitarian asylum because she "failed to establish compelling reasons for being unwilling or unable to return to Angola because of any harm that she suffered there on account of a protected ground." In particular, the BIA agreed with the IJ's finding that the 1984 attack did not rise to the level of severity required to support a grant of humanitarian asylum. With respect to the other incidents that Mambwe described, the BIA adopted the IJ's determination that the rape perpetrated by "boys from the refugee camp" in 1991 and the attack and kidnapping carried out by UNITA soldiers in 1997 did not involve persecution on account of Mambwe's race, religion, nationality, membership in a particular social group, or political opinion. The BIA therefore concluded that those incidents could not support a grant of humanitarian asylum. While the BIA noted that Mambwe "raise[d] no other arguments on appeal," it summarily affirmed the IJ's denial of her application for withholding of removal and protection under the CAT for the reasons identified by the IJ. The BIA granted Mambwe sixty days to voluntarily depart the United States before its alternate order of removal took effect.

-5-

Mambwe filed a timely petition for review of the BIA's decision, arguing that the denial of her application for asylum, withholding of removal, and protection under the CAT was erroneous in numerous respects.

## II.    DISCUSSION

Mambwe first challenges the denial of her claim for asylum.  To establish her eligibility for asylum, Mambwe bore the burden of proving that she qualifies as a "refugee."  *See* 8 U.S.C. § 1158(b)(1)(B).  In this context, "refugee" is a term of art which refers to a person who is unable or unwilling to return to her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  *Id.* § 1101(a)(42)(A).  Because the statutory definition makes the motive for persecution "critical," an applicant "must provide *some* evidence of it, direct or circumstantial."[3]  *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992).

The regulation establishing the administrative process for making asylum determinations provides that an applicant who has proved past persecution on account

---

[3]The REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, included a provision, codified at 8 U.S.C. § 1158(b)(1)(B)(i), which clarified that "the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least *one central reason* for persecuting the applicant."  (Emphasis added.)  This amendment did not "radically alter[]" the applicant's burden of proof, for "[e]ven before the passage of the REAL ID Act, [applicants] were required to prove a nexus between the alleged persecution and one of the statutory grounds."  *Singh v. Mukasey*, 543 F.3d 1, 5 (1st Cir. 2008) (first quotation from *In re J-B-N & S-M-*, 24 I. & N. Dec. 208, 214 (B.I.A. 2007)).  Because Mambwe filed her application before May 11, 2005, the effective date of the relevant provision, we need not consider the effect, if any, that the "one central reason" standard would have on Mambwe's petition.  *See, e.g.*, *Sinha v. Holder*, 564 F.3d 1015, 1021 n.3 (9th Cir. 2009).

of a protected ground is "presumed to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 1208.13(b)(1). This presumption may be rebutted, however, if the DHS proves by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality." *Id.* § 1208.13(b)(1)(i)(A). Even if the DHS meets this burden, the IJ may grant so-called "humanitarian asylum" if the applicant has either "demonstrated compelling reasons for being unwilling or unable to return to the country [of nationality] arising out of the severity of the past persecution," *id.* § 1208.13(b)(1)(iii)(A), or "established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country," *id.* § 1208.13(b)(1)(iii)(B).

In dismissing Mambwe's administrative appeal on her claim for asylum, the BIA adopted the IJ's reasoning in relevant part while adding reasoning of its own; thus, we will consider both decisions. *See Rafiyev v. Mukasey*, 536 F.3d 853, 856 (8th Cir. 2008). We review the administrative findings of fact under a substantial evidence standard. *See Manani v. Filip*, 552 F.3d 894, 901 (8th Cir. 2009). These findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Rafiyev*, 536 F.3d at 856. And the BIA's ultimate decision to deny an application for asylum is "conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D); *see Rafiyev*, 536 F.3d at 856.

There is no dispute that Mambwe met her initial burden by proving that UNITA's attack on her village in 1984 constituted past persecution on account of a protected ground. Nevertheless, Mambwe argues in her petition that the IJ and the BIA should have found that the attack and kidnapping carried out by UNITA soldiers in 1997 also constituted past persecution on account of her membership in the Mbundu ethnic or tribal group as well as her "imputed political opinion." Mambwe points to her testimony that the "whole village [of Zambezi] was attacked," the

geographic fact that Zambezi is near the Zambian border with Angola, and a State Department report on human rights practices in Zambia for 2001, which indicated that UNITA rebels had crossed the Zambian border and abducted civilians. Mambwe asserts that this evidence proves that the attack and kidnapping were "a politically-motivated attempt to deter any support for the MPLA." We disagree.

Mambwe's theory seems to rest on two major assumptions: first, that a village-wide attack necessarily involves persecution on account of political opinion or some other protected ground (or at least is more likely to involve such persecution than other types of attacks against civilians); and second, that the most plausible explanation for UNITA's incursions into Zambian territory was to persecute known, suspected, or potential supporters of the MPLA, such as Mambwe. Neither of these assumptions is self-evidently true. On the contrary, there is no shortage of alternative explanations for why rebel soldiers might carry out a village-wide attack in foreign territory without engaging in persecution on account of a protected ground, including simple lawlessness and base criminality.

Even assuming, however, that the evidence Mambwe identified could support the inference that the attack and kidnapping were politically-motivated, at least in part, we are not convinced that any reasonable adjudicator would be compelled to reach that conclusion. *See Elias-Zacarias*, 502 U.S. at 483-84 (noting that to obtain "judicial reversal" of an adverse factual determination, an applicant "must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find" in his favor). As the DHS recounts, Mambwe's own testimony about her alleged persecutors' motives was equivocal at best. For example, when she was asked to explain why the soldiers attacked Zambezi, Mambwe stated, "I don't know why they attacked; . . . they just attacked." Likewise, when she was asked to explain why the soldiers kidnapped her and several other women from Angola and Zambia, Mambwe initially stated, "they were abusing us [and] raping us [but] I don't know why they did that." Later, Mambwe said she agreed with the notion that the soldiers

-8-

were merely pursuing their own gratification. While Mambwe reported that she heard the UNITA soldiers went to Zambezi looking for "somebody"—presumably, a member of the MPLA—she went on to say that the soldiers did not suspect her of being an enemy and that she did not think they knew she was from Angola.

After considering the record as a whole, we find that Mambwe has failed to show that any reasonable adjudicator would be compelled to conclude that the attack and kidnapping carried out by UNITA soldiers in 1997 involved persecution on account of her race, religion, nationality, membership in a particular social group, or political opinion. Accordingly, we may not overturn the IJ and the BIA's determination that the attack and kidnapping did not constitute past persecution on account of a protected ground.[4]

Mambwe next contends that the DHS failed to rebut the presumption that she had a well-founded fear of future persecution arising from UNITA's 1984 attack on her village. We have no difficulty concluding that substantial evidence supports the IJ and the BIA's determination that the DHS met its burden by showing that the end of the civil war between the MPLA and UNITA amounted to a fundamental change in circumstances. Specifically, a State Department report on human rights practices in Angola for 2003 indicates that UNITA entered into a cease-fire agreement with the MPLA-controlled Angolan government in April 2002. Following the cease-fire, UNITA demobilized, disarmed, and disbanded its military. Killings and abductions attributed to UNITA reportedly stopped entirely. In November 2002, UNITA signed a peace agreement that officially ended the twenty-seven year civil war. The report

---

[4]By the same token, Mambwe has failed to show that any reasonable adjudicator would be compelled to conclude that the rape perpetrated by "boys from the refugee camp" in 1991 involved persecution on account of a protected ground. Even if Mambwe had made such a showing, however, we doubt whether the rape could support a grant of relief from removal to Angola since it allegedly occurred in Zambia.

noted in summary that "UNITA [has] progressed significantly in its . . . transition to a demilitarized political organization and the largest opposition party." These developments led most of the refugees who were displaced by the civil war to return to Angola. According to estimates provided in a 2006 State Department report on general conditions in Angola, "more than 300,000 of Angola's original 450,000 refugees have returned home," while an additional 53,000 refugees were slated to return in 2005 as part of a repatriation program organized by the United Nations High Commissioner for Refugees.

Despite the uncontroverted evidence that conditions in Angola have fundamentally changed, Mambwe insists that she continues to fear persecution because the civil war "was not put to rest . . . by the signing of the peace accord or even by the official disarmament of UNITA."[5] Yet Mambwe has not identified any evidence to support the notion that UNITA continued to engage in militant or repressive conduct after the civil war officially ended in 2002. Equally, Mambwe has not identified any evidence that individual members of UNITA sought revenge against their former enemies (real or perceived), such as members of the Mbundu ethnic or tribal group who supported the MPLA. Mambwe instead asserts in general terms that Angola is "still overridden by civil unrest and violence" and that human rights violations are "prevalent." This exaggerated description of post-war conditions in

---

[5]Incidentally, Mambwe now claims that she fears persecution by the Angolan government in addition to UNITA. Mambwe does not allege that she suffered past persecution at the hands of the MPLA-controlled government; rather, one of the central premises of her application for asylum was her membership in an ethnic or tribal group known to be "aligned" with the MPLA. Mambwe testified that she did not fear any person or group in Angola apart from UNITA, and she makes no attempt in her petition to explain why the Angolan government might target her for persecution on account of a protected ground. Thus, we will limit our analysis to whether the IJ and the BIA erroneously determined that the DHS rebutted the presumption that Mambwe had a well-founded fear of future persecution arising from UNITA's attack on her village in 1984.

Angola is beside the point, inasmuch as a "general state of unrest" is "typically insufficient to qualify as persecution." *See Habchy v. Filip*, 552 F.3d 911, 914 (8th Cir. 2009) (quoting *Al Yatim v. Mukasey*, 531 F.3d 584, 588 (8th Cir. 2008)); *see also Mohamed v. Ashcroft*, 396 F.3d 999, 1003 (8th Cir. 2005) ("Harm arising from general conditions such as anarchy, civil war, or mob violence will not ordinarily support a claim of persecution."). Though we do not question the sincerity of Mambwe's avowed fear of UNITA, she has not shown that it was unreasonable for the IJ and the BIA to determine that the end of the civil war amounted to a fundamental change in circumstances. We therefore reject Mambwe's contention that the DHS failed to rebut the presumption that she had a well-founded fear of future persecution arising from UNITA's attack on her village in 1984.

Mambwe's final argument regarding her claim for asylum is that even if she lacked a well-founded fear of future persecution, she was "entitled" to humanitarian relief based on the severity of the past persecution that she suffered. Mambwe focuses mostly on the severity of the attack and kidnapping carried out by UNITA soldiers in 1997. But as we have said, we may not overturn the IJ and the BIA's determination that the attack and kidnapping did not constitute past persecution on account of Mambwe's race, religion, nationality, membership in a particular social group, or political opinion. As a result, Mambwe cannot rely on the attack and kidnapping to establish that she is a refugee under 8 U.S.C. § 1101(a)(42)(A). Since humanitarian asylum may only be granted to "an alien found to be a refugee on the basis of past persecution," it follows that Mambwe cannot establish her eligibility for humanitarian asylum based on the attack and kidnapping.[6] *See* 8 C.F.R. § 1208.13(b)(1)(iii)(A) (cross-referencing *id.* § 1208.13(b)(1)(i)); *see also Esenwah v. Ashcroft*, 378 F.3d 763, 766-67 (8th Cir. 2004); *Menendez-Donis v. Ashcroft*, 360 F.3d 915, 919 (8th Cir. 2004).

---

[6]The same reasoning would foreclose the alternative argument, which Mambwe did not fully develop in her petition, that she was eligible for humanitarian asylum based on the rape perpetrated by "boys from the refugee camp" in 1991.

-11-

The question thus becomes whether UNITA's attack on Mambwe's village in 1984—which did constitute past persecution on account of a protected ground—rises to the level of severity required to support a grant of humanitarian asylum. We have consistently noted that humanitarian asylum is reserved for instances where an applicant has suffered persecution that was "particularly atrocious." *See, e.g.*, *Cigaran v. Heston*, 159 F.3d 355, 358 (8th Cir. 1998). Relevant factors to consider include "the degree of harm suffered, the length of time over which the harm was inflicted, and evidence of psychological trauma resulting from the harm." *Abrha v. Gonzales*, 433 F.3d 1072, 1076 (8th Cir. 2006) (citing *In re N-M-A-*, 22 I. & N. Dec. 312, 326 (B.I.A. 1998) (en banc)).

Mambwe does not offer any meaningful argument about the severity of the 1984 attack. Our independent examination of the record shows that Mambwe denied being physically harmed during the attack and reported that she has not sought medical treatment for symptoms of psychological trauma. Mambwe was not detained by UNITA forces, and she gives no indication of how long the attack itself lasted. While Mambwe presumes that her father and brothers were conscripted or killed, she apparently did not witness their deaths. In our view, this evidence fails to establish that it was an abuse of discretion for the IJ and the BIA to deny Mambwe's request for humanitarian asylum. *See Abrha*, 433 F.3d at 1076 ("Not all harm is severe enough to warrant a discretionary grant of asylum . . . ."). We therefore reject Mambwe's contention that she was "entitled" to humanitarian relief based on the severity of the past persecution that she suffered.[7]

---

[7]Mambwe presents an alternative basis for humanitarian asylum in her reply brief, asserting that there is "[a] reasonable possibility that she would suffer other serious harm upon removal to [Angola]." *See* 8 C.F.R. § 1208.13(b)(1)(iii)(B). Mambwe did not raise this argument in her opening brief, so we decline to consider it. *See, e.g.*, *Navarijo-Barrios v. Ashcroft*, 322 F.3d 561, 564 n.1 (8th Cir. 2003).

Mambwe also challenges the denial of her claims for withholding of removal and protection under the CAT. We do not reach the merits of either challenge because Mambwe failed to raise these issues in her appeal to the BIA. *See, e.g.*, *Rafiyev v. Mukasey*, 536 F.3d 853, 858 (8th Cir. 2008) (citing *Etchu-Njang v. Gonzales*, 403 F.3d 577, 582 (8th Cir. 2005)); *see also Zine v. Mukasey*, 517 F.3d 535, 540-41 (8th Cir. 2008) (warning that judicial review of a claim for withholding of removal may be "precluded for failure to exhaust" if a petitioner does not specifically appeal the IJ's denial of that claim to the BIA); *Margos v. Gonzales*, 443 F.3d 593, 600 (7th Cir. 2006) (holding that the petitioner failed to exhaust a claim for protection under the CAT because she did not raise the issue in her appeal to the BIA). There is a split of authority in this circuit about "whether the failure to raise an *issue* before the BIA is a jurisdictionally-fatal failure to exhaust an administrative *remedy* . . . [under] 8 U.S.C. § 1252(d)(1)," or if it "simply raises the non-jurisdictional question whether review of that issue is precluded by the doctrine of administrative exhaustion." *Zine*, 517 F.3d at 539-40. The distinction makes no difference to our analysis. For even if we assume that Mambwe's failure to exhaust the relevant issues is not jurisdictional, we see no reason why an exception to the issue exhaustion requirement would be warranted here. *Cf. Etchu-Njang*, 403 F.3d at 584 ("Assuming for the sake of argument that there may be exceptions to the issue exhaustion requirement, we do not agree that an exception could be justified in this case.").

Although we have recognized that two of our sister circuits hold that an issue may be considered exhausted "if the BIA thoroughly addresses [the] issue *sua sponte*," we have yet to decide whether that exception applies in this circuit. *See Rafiyev*, 536 F.3d at 858-59 (citing *Sidabutar v. Gonzales*, 503 F.3d 1116, 1119-22 (10th Cir. 2007); *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1186 (9th Cir. 2001)). *But cf. Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1251 (11th Cir. 2006) (per curiam) ("[W]e think the goals of exhaustion are better served by our declining to review claims a petitioner, without excuse or exception, failed to present before the BIA, even if the BIA addressed the underlying issue *sua sponte*."). We need not

weigh in on the general applicability of the exception; because the BIA summarily affirmed the IJ's denial of Mambwe's application for withholding of removal and protection under the CAT without thoroughly addressing the underlying issues, the exception clearly would not apply in this case. *See Rafiyev*, 536 F.3d at 859 ("We need not decide whether . . . discussion by the BIA ever can exhaust an issue not raised by the petitioner, because the meager record created here is insufficient to do so."); *see also Sidabutar*, 503 F.3d at 1122 ("Of course, this [exception] should be construed narrowly to circumstances where the BIA issues a full explanatory opinion or a discernible substantive discussion on the merits over matters not presented by the alien.").[8]

Finally, Mambwe argues that the IJ and the BIA violated her due process rights by failing to develop the record and to consider all of the evidence, by misapplying various legal standards, and by failing to apply pertinent legal doctrines. Mambwe offers little or no original material in support of her due process claim; she instead merely reiterates, in constitutional terms, the arguments that we have already discussed. *Cf. Awad v. Gonzales*, 494 F.3d 723, 727 (8th Cir. 2007) (rejecting a petitioner's due process claim because it "principally reiterate[d] his disagreement with the IJ's and BIA's determinations against him"), *cert. denied*, 553 U.S. ---, 128 S. Ct. 2474 (2008). Nevertheless, to the extent Mambwe's due process claim relates to the proceedings before the IJ, we may not consider it because Mambwe failed to

---

[8]Even if we were to reach the merits, we still would not overturn the IJ and the BIA's denial of Mambwe's claims for withholding of removal and protection under the CAT. We note in this regard that Mambwe's failure to establish that she had a well-founded fear of future persecution in Angola would preclude her from meeting the higher burden of proof associated with her claim for withholding of removal. *See Samedov v. Gonzales*, 422 F.3d 704, 708 (8th Cir. 2005). Similarly, because Mambwe has not identified any evidence that she might be tortured for reasons unrelated to her claims for asylum and withholding of removal, her claim for protection under the CAT would necessarily fail as well. *See id.*

raise the issue in her appeal to the BIA.[9] *See, e.g.*, *Rafiyev*, 536 F.3d at 858 (citing *Etchu-Njang*, 403 F.3d at 582); *see also Kimumwe v. Gonzales*, 431 F.3d 319, 323 (8th Cir. 2005) (declining to consider a petitioner's "contentions that he was denied due process in the hearing before the [IJ], because he failed to present those issues in an appeal to the BIA"). To the extent Mambwe's due process claim relates to the proceedings before the BIA, we reject it on the merits because Mambwe has not shown that her administrative appeal was fundamentally unfair. *See Castro-Pu v. Mukasey*, 540 F.3d 864, 869 (8th Cir. 2008) ("To be entitled to relief on due process grounds, a petitioner must show fundamental unfairness and prejudice, that is, that the outcome of the proceeding may well have been different absent the procedural irregularity.").

## III. CONCLUSION

For the foregoing reasons, we deny Mambwe's petition for review. Because Mambwe moved for a stay of removal within sixty days of the BIA's decision, we hold that our order granting her motion included a stay of her voluntary-departure period from the date on which her motion was filed.[10] *See Clemente-Giron v. Holder*,

----

[9]Mambwe asserts that her due process claim is immune from the issue exhaustion requirement because "the IJ's misapplication of legal standards or failure to apply the law [are] not . . . mere procedural error[s] that the [BIA] could remedy." *Cf. Geach v. Chertoff*, 444 F.3d 940, 945 (8th Cir. 2006) (holding that reviewing courts "have subject-matter jurisdiction over aliens' unexhausted constitutional claims *unless* the claims concern *procedural errors correctable by the administrative tribunal*" (emphasis added)). We are not persuaded, however, because misapplying legal standards and failing to apply pertinent legal doctrines (here, doctrines relating to the motive for alleged persecution) would plainly constitute procedural errors that the BIA had authority to correct, either by granting Mambwe the relief she requested or by remanding to the IJ with instructions on how to apply the law properly.

[10]A regulation adopted by the Executive Office for Immigration Review ("EOIR") provides that as of January 20, 2009, "any grant of voluntary departure shall

556 F.3d 658, 664 (8th Cir. 2009). The remaining time that Mambwe has to voluntarily depart the United States will start to run when our mandate issues. *See Falaja v. Gonzales*, 418 F.3d 889, 899-900 (8th Cir. 2005).

_____

terminate automatically upon the filing of [a] petition [for review] or other judicial challenge." 8 C.F.R. § 1240.26(i). Since the EOIR has expressly stated that this regulation is to be applied only prospectively, it does not affect our order granting a stay of Mambwe's voluntary-departure period. *See* Voluntary Departure: Effect of a Motion to Reopen or Reconsider or a Petition for Review, 73 Fed. Reg. 76,927, 76,936 (Dec. 18, 2008).